THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FRANKLIN SCOTT MARCH, Defendant-Appellant.
Fourth District   No. 4—92—0707

Opinion filed September 2, 1993.

Daniel D. Yuhas and Karen Munoz, both of State Appellate Defender's Office, of Springfield, for appellant.

Charles G. Reynard, State's Attorney, of Bloomington (Norbert J. Goetten, Robert J. Biderman, and Leslie Hairston, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

Following a jury trial in the circuit court of McLean County, defendant was convicted of aggravated criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 12—14(b)(1)) and sentenced to 14 years' imprisonment, to run consecutively to a six-year sentence imposed on revocation of probation in another case. The instant charge alleged that defendant, who was over the age of 17, committed an act of sexual penetration with D.C., a child of approximately two years of age. On October 9, 1991, a hearing was held pursuant to section 115—10(b)(1) of the Code of Criminal Procedure of 1963 (Code) (Ill. Rev. Stat. 1991, ch. 38, par. 115—10(b)(1)) in order to determine admissibility of the victim's out-of-court statements. The trial court ruled there were sufficient safeguards of reliability to admit the statements under the exception to the hearsay rule provided by section 115—10 of the Code. The defendant's first trial ended in a hung jury. He was convicted by a jury on retrial. On appeal, defendant contends (1) the State failed to prove his guilt beyond a reasonable doubt, (2) the trial court erred in admitting evidence of the victim's out-of-court statements because there were insufficient safeguards of reliability, and (3) at sentencing, the trial court improperly considered, as a factor in aggravation, his decision to not make a statement on his own behalf.

Defendant was 24 years of age at the time of trial and had been a friend of Julie Casey since the summer of 1990. During that summer, defendant stayed at Casey's apartment a couple days each week, along with two other roommates. During this time, Casey's daughter D.C. lived with Casey's brother. In March 1991, someone tried to break into Casey's apartment. Because Casey no longer felt safe living in that apartment, she accepted defendant's offer to temporarily move to the small house he shared with a roommate, Jonathan Hulvey. Casey, who was pregnant with a second child, moved in with her two-year-old daughter on March 6, 1991, bringing along a seven-day supply of clothing for each of them, plus a few toys for the child. Sleeping arrangements varied from day to day. The house had only two bedrooms, so Casey and her daughter sometimes slept together on the sofa and other times in defendant's bed. Defendant slept either on the sofa or together with Casey and her daughter in his bed. Defendant and Casey never engaged in sexual relations.

On April 22, 1991, Casey saw her daughter sitting on a chair with her legs spread out and her index finger in her vagina. She told her to stop it, warning her that she would hurt herself. D.C. replied, "Scott did it, Mommy." Casey asked her what it was that Scott did, and D.C. replied, "Scott puts his finger there."

Although defendant's full name is Franklin Scott March, he is known by the name Scott. At the pretrial hearing, Casey testified that defendant was the only "Scott" D.C. had known. At trial, she stated that D.C. actually knew one other Scott, a playmate D.C. had not seen since the previous summer and who was known as "Scotty." Later at trial, it was learned from another witness that D.C. had met someone named Scott Rhodes, but D.C. referred to him as "Darren."

Casey became very upset when D.C. told her what Scott had done. She immediately called a crisis center, where she was advised to contact the family physician and the police. She then called a friend, Elizabeth Drnec, and asked that she come over as soon as possible. When Drnec arrived, Casey told D.C. to show Drnec what Scott had done to her. (According to Drnec, Casey merely told D.C. to show what she had showed Mommy.) D.C. responded by putting her finger in her vagina. Drnec then called some friends to drive them to the emergency room.

While they waited, Casey examined D.C.'s vaginal area and observed that it was red. D.C. said it was sore when she went to potty and took baths. Casey offered conflicting testimony regarding the time that the alleged sexual abuse occurred. At the pretrial hearing, she was asked on direct examination:

."Q. [By prosecutor:] Did [D.C.] ever say when this happened?

A. [By Casey:] No. She told me that night, and so I had thought it happened—[i]t had to have happened recently, when we were staying there.

* * *

Q. Okay. And was there any statement by [D.C.] regarding being put to bed?

A. Yeah, when I asked [D.C.] when it had happened I thought maybe she would say—I don't know what I thought she would say. She just said, 'When I was in bed sleeping.' "

At the hospital, D.C. had her vital signs taken and was then placed in an examination room, accompanied by her mother and Drnec. While D.C. was sitting on the treatment table, she began putting her finger back in her vagina. Her mother told her to stop doing it and reminded her she could hurt herself. According to Drnec, D.C. replied, "But Scott does it." According to Casey, she only said, "Okay, Mom."

The initial examination was performed by Nurse Yoder, who said that D.C. had complained to her mother about redness in her vaginal area. Yoder spoke with Casey and then questioned D.C. through her mother about "why she was hurt and whatever." D.C. responded by pointing to her vaginal area and said, "Scott touches me down there when he is tired and goes to sleep." Yoder took a medical history for the child and learned from Casey that she had a history of bedwetting in the last six weeks. (Casey and D.C. moved in with defendant six weeks and five days prior to this examination.) Yoder testified it was possible that the vaginal redness was caused by frequent wetting.

Dr. McEntyre examined D.C. and found redness in the genital area and also the absence of a hymen. Although it is possible D.C. was born without a hymen, he testified it is about a 99% probability that she had one at birth. Dr. McEntyre found no signs of bleeding. He stated that it is common to have bleeding when a hymen is ruptured, but it does not always occur. If the hymen had been ruptured a few days before his examination, he would not have expected to see blood. Casey testified that she never saw blood on D.C. or on her diapers, but explained that she was never looking for it. Dr. McEntyre stated that a ruptured hymen could produce anywhere from a moderate amount of bleeding to barely noticeable bleeding.

Dr. McEntyre agreed with the prosecutor's hypothetical scenario that D.C.'s missing hymen was consistent with someone placing his index finger in her vagina. On cross-examination, he acknowledged he had no idea how long the hymen had been gone, assuming it ever ex-

isted. He also stated it could, in rare cases, disintegrate on its own, without trauma. Finally, he agreed that the hymen could rupture if the child inserted her own finger or some other object such as a crayon.

D.C. was tested for a urinary tract infection to determine the cause of the vaginal redness. D.C. had been diagnosed in January with a urinary infection, which caused vaginal redness through February. The current test was negative. Tests for sexually transmitted diseases were also negative. Dr. McEntyre testified that redness in D.C.'s vaginal area could have had any number of causes.

After leaving the hospital, Casey and Drnec returned to defendant's house and began to pack her belongings. Defendant came home and helped them load the car. Casey said nothing to defendant because she was afraid he might leave town if he knew what had happened. Drnec told defendant that she had an argument with her boyfriend and that Casey was going to move in with her for awhile. Defendant had no reaction to this information.

The next day, Casey, D.C., and Drnec met with Detective Michael Fazio of the Bloomington police department. Fazio is assigned to the youth division and has been investigating sexual offenses for over two years. First, he interviewed Casey alone, getting a brief summary of the case. He then had D.C. brought into the interview room and questioned her in the presence of her mother. Fazio had been trained to begin the interview with a question such as, "Do you know why you are here," and to build off anything the child says. This usual line of questioning was not effective with D.C. Fazio explained this was probably due to her young age. The first question to which she responded was, "[T]ell me about Scott." At the section 115—10 hearing, no mention is made of any opening remarks. The record states:

"Q. [Defense attorney:] Now when you began your conversation with [D.C.], did you preface your conversation to her by asking her what Scott did?

A. [Fazio:] In this case that was the only way to do it.

Q. So the answer is yes, you asked the child, 'What did Scott do to you?'

A. Correct."

D.C.'s response to this question was, "Scott touches my body." After saying this, D.C. became withdrawn and would not respond to further questioning. In order to determine what D.C. meant by "my body," he asked her if she knew what her private parts were. D.C. did not know. Fazio asked her mother what D.C. calls her private parts and was told she refers to them as her body. Fazio showed D.C. a

drawing illustrating the front and back view of a naked preschool-age girl. He explained to D.C. that the drawing represented her. He then asked her to pick out a crayon and show him her "body." She took the crayon and colored on the vaginal area, breasts, and buttocks. The drawings were put away and Fazio asked her more questions about Scott. D.C. did not respond until Fazio asked her again what Scott did. D.C. replied, "Scott owees my body and Scott owees my stomach." The interview ended shortly after this statement. The following night, he took statements from Casey and Drnec.

On April 27, 1991, Fazio interviewed defendant. He read defendant his *Miranda* rights and explained the accusations against him. When he asked whether he had committed the act of placing his finger in D.C.'s vagina, defendant replied that he could not admit to his guilt. Fazio considered this an unusual reply and, when asked what he meant by it, defendant denied that he inappropriately touched D.C., saying, "I didn't do it." Fazio discussed the possible benefits of confessing, and defendant replied that he had no reason to confess—he was going to prison anyway. Fazio interviewed defendant again on May 2, 1991, and, after discussing why he should confess, defendant asked to leave in order to think about it. Fazio asked defendant to call him if wanted to talk and, a short time later, defendant called and set an appointment for the following day. Defendant came in on the evening of November 3, 1991, and, after discussing why he should confess, replied that he had no reason to confess. When asked why he could not confess, he replied he was worried about what his friends would think. (These two statements were the result of numerous responses to questioning in an interview lasting 15 to 30 minutes and should not be read as a single response or colloquy.) Fazio interviewed defendant again on July 1, 1991, and found him to be much more hostile, denying that he committed the crime and saying the burden of proof was on Fazio's shoulders. Soon after, defendant was placed under arrest.

Defendant disputed Fazio's account of the interviews. He testified that when Fazio asked him, "Why can't you just admit your guilt," he replied that he could not admit his guilt because he had done nothing wrong. When Fazio said he could help defendant, defendant replied there was no way Fazio could help him and, if he had done the offense, he would go to prison whether Fazio could help him or not. When asked about his statement that he was worried what people would think, he agreed that he had, in fact, made the statement. He explained he could not believe he was being questioned in a matter such as this and worried what his family would think. Defendant also

disputes Fazio's statement that defendant had voluntarily called him and set an appointment to be interviewed on May 3, 1991. Defendant contends that when he left the May 2, 1991, interview, Fazio ordered him to call him back after thinking about what they had said. He contends he only called because he was told to call.

Casey testified D.C. exhibited changes in her behavior about two weeks after moving in with defendant on March 6, 1991. The behavioral changes included severe temper tantrums (worse than those she was having before), nightmares, and wetting herself approximately three to four times per hour. She also began telling her mother that she hated her, something she never said before. Prior to the move, the child was more or less potty trained and would tell her mother when she needed to go to the bathroom.

During the time Casey shared the house with defendant, she was on medication that made her very sleepy. There were occasions when Casey would fall asleep on the sofa while D.C. was still awake. Sometimes she would fall asleep on the couch and then wake up to move to the bedroom. On some of these occasions, she would find D.C. asleep in bed with defendant.

Defendant disagreed with Casey's recollection of their sleeping habits. He said he usually returned from work at about 10:30 p.m. or later and often found D.C. and her mother asleep on the sofa. He would awaken them and have them move to the bedroom because his roommate often brought friends over late at night. His purpose was merely to help each of them stay out of each other's way. He denied he ever put D.C. in bed while her mother was sleeping. He also denies he ever shared a bed with D.C. while her mother slept on the sofa. Casey testified that D.C. was not able to go to bed by herself, but would need someone to lie down with her. Defendant pointed out that D.C. did not need just someone to lie down with her, but specifically needed her mother. He admitted that he had put D.C. to bed before, but only while her mother was awake and getting ready for bed herself. Casey denied this, saying when she was awake she would be the only person to put D.C. in bed.

The jury heard numerous accounts of D.C.'s dress and behavior while living in defendant's house. During the day, D.C. would wear regular children's underwear with an adult-sized T-shirt, but at night she wore diapers. Casey was the only one to change her diapers, but defendant would sometimes change her underwear during the day.

Defendant's roommate Hulvey testified that he often observed D.C. wearing only a grown-up's T-shirt, with nothing underneath, especially after she had just gotten out of her bath. On four or five dif-

ferent occasions, he observed D.C. touching her vagina. He first noticed this behavior a couple of days after they moved in. He also testified that he never saw Scott sleeping alone with D.C. He did notice Casey asleep on the sofa on occasion, but D.C. was always with her. Hulvey stated that D.C. got along well with defendant, played with him, and displayed no sign that she feared him.

Keith Arteman, friend and co-worker of defendant, testified he helped Casey move into defendant's home. He visited the house nearly every day and observed that more often than not D.C. was dressed in a T-shirt without underwear. He said she was often running around half naked and that on three or four occasions when she first moved in he saw her fondling herself. Another friend, Marilyn Lavoie, lived across the street and visited approximately three times a week. She testified that D.C. was unclothed from the waist down on more than half the occasions she visited. She also claims she observed D.C. fondling herself with a crayon. Casey testified that D.C. was never naked from the waist down in the presence of either Arteman or Lavoie. Furthermore, she contends D.C. could not have fondled herself with a crayon because she did not have any crayons at defendant's house. Casey had seen D.C. put her hands in her underwear a number of times, but assumed she was merely exploring.

In his closing argument, defense counsel questioned how D.C. could wet herself three or four times per hour and, with only a seven-day supply of clothing on hand, could always manage to be dressed in underwear. Defense counsel also suggested that D.C.'s vaginal redness may have been the result of D.C.'s wetting herself three or four times per hour. Casey disagreed, saying she always kept her changed.

Finally, Casey testified that she overheard a conversation between Lavoie and Arteman outside the courtroom during the first trial. Lavoie allegedly told Arteman she would say anything to get Scott off. Arteman allegedly responded "I know. I will too." Both LaVoie and Arteman denied this conversation ever took place.

On May 18, 1992, a hearing was held to determine the competency of D.C., now three years of age. She was unable to tell the color of her own hair, whether she lived in Bloomington or Normal, or the difference between the truth and a lie. She also testified she had been in the courtroom the previous evening. The prosecutor stated this could not be true, but she continued to state her mother had brought her there the previous evening. Over defense counsel's objection, the trial judge found D.C. not competent to testify, noting she was incapable of perceiving time and space and had no recognition or appreciation of the obligation to testify truthfully.

Defendant contends the State failed to prove him guilty beyond a reasonable doubt. When faced with a challenge to the sufficiency of the evidence, the reviewing court is not required to ask itself whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt. Rather, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Campbell* (1992), 146 Ill. 2d 363, 374, 586 N.E.2d 1261, 1265-66.) A reviewing court will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses, and will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *Campbell*, 146 Ill. 2d at 375, 586 N.E.2d at 1266.

Initially, defendant attacks the sufficiency of the physical evidence linking him to the crime. The only physical evidence that a crime occurred at all is the victim's ruptured hymen and vaginal redness. No proof was offered that the child was born with a hymen, although it is highly unlikely that she was born without one. It is also possible that the hymen could have atrophied or disintegrated on its own. If she did have a hymen and it was ruptured, then it is also likely for bleeding to occur. No evidence of bleeding was found by either Casey or Dr. McEntyre. Casey explained that she had never looked for bleeding.

There is also no physical evidence that anyone, other than the child herself, inserted a finger in D.C.'s vagina. Dr. McEntyre testified that vaginal redness in conjunction with absence of a hymen is consistent with someone having placed a finger in the child's vagina. However, he also testified that the hymen could have been ruptured by the child herself. Dr. McEntyre also testified that the vaginal redness could have been caused by any number of things. Casey admitted she had seen D.C. with her hands in her pants on a number of occasions, and numerous witnesses testified they saw her fondling herself. Moreover, the child was wetting herself three or four times an hour all day long, which may have contributed to the redness. In January 1991, prior to moving in with defendant, D.C. had vaginal redness caused by a urinary tract infection. However, Dr. McEntyre's tests for a urinary tract infection on this occasion were negative.

Casey testified to the severe behavioral changes D.C. exhibited a few weeks after moving into defendant's house. Yet, no evidence was offered to show that a two-year-old's excessive wetting, temper tan-

trums, and nightmares are indicative of sexual abuse. No psychological, sociological, or other expert testimony was heard to establish the relevance of any of these behavioral characteristics.

Defense counsel, in his closing argument, suggested that Casey and her daughter lived a transient existence, which may have been responsible for her erratic behavior. Casey testified that she had lived apart from her daughter for five months during the previous year. D.C. lived with Casey's brother during this time. Defense Counsel argued that forcing a two-year-old to suddenly move from her home is at least a plausible explanation for D.C.'s changes in behavior. Also significant is the testimony of defendant's roommate that D.C. showed no indication that she was afraid of defendant. On the contrary, she apparently got along well with defendant and they seemed comfortable around each other.

Another major element of the State's evidence was drawn from defendant's remarks made to Fazio. Great effort was expended attempting to conjure a confession out of these interviews. The most significant feature of the remarks is that they appear most inculpatory when they are read as a continuous statement. However, as Fazio pointed out, these remarks were not made together but interspersed throughout the course of an intensive period of questioning. Fazio's accounting of the interviews often seems to ignore defendant's repeated assertions that he did not commit the crime. At one point Fazio was asked what defendant had said when asked to explain his remark that he could not admit to his guilt. Fazio responded, "Well, he evaded the question. *All he would tell me is I didn't do it*, and he would never answer why he said that." (Emphasis added.) Later, Fazio testified he could not recall if defendant had ever told him he did nothing wrong. It may be true that defendant did not use those exact words, but this begs the question in light of his testimony that defendant repeatedly denied committing the crime. Fazio's account of these interviews implies that defendant was possibly on the verge of offering a confession. The fact remains that he did not confess, and Fazio's account of these interviews, while perhaps offering some insight into the course of the investigation, yields little substance in the determination of defendant's guilt.

Without expert testimony linking D.C.'s behavior to symptoms of sexual abuse, we are left with the testimony of Dr. McEntyre which, by itself, appears incapable of proving beyond a reasonable doubt that a sexual assault even occurred. The conviction, if it is to stand, must do so on the basis of the victim's out-of-court statements. D.C. was heard to implicate someone named Scott by four people on four differ-

ent occasions. It is surprising the record gives no indication that anyone ever asked D.C. to clarify the identity of the person named Scott. Even so, the fact that D.C. had met only two other people named Scott, both of them remote acquaintances, allows for a reasonable inference that she was speaking of the person with whom she not only lived but occasionally shared a bed.

According to medical records, D.C. was born on December 13, 1988, making her just over two years and four months old at the time Fazio interviewed her. The trial commenced on May 18, 1992, making D.C. three years and five months old at the time the court ruled her incompetent to testify. At the pretrial hearing, the clerk swore in the child and was forced to instruct D.C. that she should say "yes" in response. The trial judge was not even certain that D.C. responded to this request. D.C. admitted she did not know the difference between the truth and a lie and, as described earlier, claimed that she had been in the courtroom the night before with her mother, even though it was clear she had not.

The out-of-court statements, if accepted as true, present solid evidence of defendant's guilt. Without the statements, the State has virtually no case against defendant. Accordingly, our determination of whether defendant was proved guilty beyond a reasonable doubt hinges upon the resolution of the next issue; namely, whether the trial court erred in ruling that the out-of-court statements were admissible under the exception to the hearsay rule provided under section 115—10 of the Code.

Section 115—10(a)(2) of the Code provides that for any prosecution of a sexual offense committed on a child under age 13, testimony of the child's out-of-court statements which describe any complaint of such an act or matter or detail pertaining to any act which is an element of the charged offense is admissible as an exception to the hearsay rule. (Ill. Rev. Stat. 1991, ch. 38, par. 115—10(a)(2).) Admission of this testimony is subject to section 115—10(b), which requires:

"Such testimony shall only be admitted if:

(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child either:

(A) Testifies at the proceeding; or

(B) Is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement." Ill. Rev. Stat. 1991, ch. 38, par. 115—10(b).

Our courts have held that the legislature intended to include within the meaning of "unavailable witnesses" those children who are unable to testify because of fear, inability to communicate in the courtroom setting, or incompetence. (*People v. Rocha* (1989), 191 Ill. App. 3d 529, 539, 547 N.E.2d 1335, 1341-42.) Incompetence to testify does not necessarily render the child's out-of-court statements unreliable. The determination of such issues must be made on a case-by-case basis. *Rocha*, 191 Ill. App. 3d at 539, 547 N.E.2d at 1341.

The requirement that the court find that the "time, content, and circumstances" of the statement provide sufficient safeguards of reliability has been held to secure compliance with defendant's sixth amendment right to be confronted with the witnesses against him. (U.S. Const., amend. VI; *Rocha*, 191 Ill. App. 3d at 541, 547 N.E.2d at 1343.) The Supreme Court noted that while the confrontation clause and hearsay rules are generally designed to protect similar values, their prohibitions may not be equated. The confrontation clause may act as a bar to the admission of evidence that might otherwise be admissible under an exception to the hearsay rule. (*Idaho v. Wright* (1990), 497 U.S. 805, 111 L. Ed. 2d 638, 110 S. Ct. 3139.) Defendant has not argued a violation of the confrontation clause, but the issue is so intertwined with the admissibility of hearsay statements under section 115—10 of the Code that we cannot avoid addressing it.

An incriminating statement, admissible under an exception to the hearsay rule, fulfills the requirements of the confrontation clause only if it bears adequate indicia of reliability. (*Wright*, 497 U.S. at 814-15, 111 L. Ed. 2d at 651-52, 110 S. Ct. at 3146.) Unlike the strictures of our section 115—10 statute, the confrontation clause does not require that a witness be unavailable. (*White v. Illinois* (1992), 502 U.S. 346, 116 L. Ed. 2d 848, 112 S. Ct. 736, *aff'g* (1990), 198 Ill. App. 3d 641, 555 N.E.2d 1241.) The indicia of reliability standard can be met in two ways; where the evidence falls within a firmly rooted hearsay exception, or where the statement is supported by a showing of particularized guarantees of trustworthiness. (*Ohio v. Roberts* (1908), 448 U.S. 56, 66, 65 L. Ed. 2d 597, 608, 100 S. Ct. 2531, 2539.) The hearsay exception provided under section 115—10 is not a firmly rooted hearsay exception. *People v. Coleman* (1990), 205 Ill. App. 3d 567, 563 N.E.2d 1010, *appeal denied* (1991), 136 Ill. 2d 547, 567 N.E.2d 335.

The particularized guarantees of trustworthiness must be shown from the totality of the circumstances, but the Supreme Court has limited this review to only those circumstances surrounding the making of the statement. (*Wright*, 497 U.S. at 819, 111 L. Ed. 2d at 655, 110 S. Ct. at 3148.) The court explained that the circumstantial guar-

antees of trustworthiness which form the basis of the various exceptions to the hearsay rules are those that existed at the time the statement was made and do not include those that may be added in hindsight. (*Wright*, 497 U.S. at 820, 111 L. Ed. 2d at 655, 110 S. Ct. at 3149.) Therefore, the rationale for gauging the truthfulness of the out-of-court statement is the same rationale as that underlying the firmly rooted exceptions to the hearsay rule, *i.e.*:

> "[I]f the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, then the hearsay rule does not bar admission of the statement at trial. \*\*\*
>
> \*\*\* [U]nless an affirmative reason, arising from the circumstances in which the statement was made, provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial, the Confrontation Clause requires exclusion of the out-of-court statement." *Wright*, 497 U.S. at 820-21, 111 L. Ed. 2d at 655-56, 110 S. Ct. at 3149-50.

Medical evidence corroborating a child's allegations of sexual abuse, therefore, may not be used to establish the trustworthiness of the out-of-court statements. The court recognized the danger that a jury will rely on partial corroboration to mistakenly infer the trustworthiness of the entire statement. (*Wright*, 497 U.S. at 824, 111 L. Ed. 2d at 658, 110 S. Ct. at 3151.) Accordingly, the hearsay evidence must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial.

The court declined to endorse a mechanical test for determining "particularized guarantees of trustworthiness." Instead, the court identified a number of relevant factors such as spontaneity, consistent repetition, mental state of declarant, use of terminology unexpected of a child of similar age, and lack of motive to fabricate. These factors are not exclusive and courts have considerable leeway in their consideration of appropriate factors. (*Wright*, 497 U.S. at 821-22, 111 L. Ed. 2d at 656, 110 S. Ct. at 3150.) The court rejected a rule that out-of-court statements made by a person found incompetent to testify at trial are *per se* unreliable. Although an inability to communicate to a jury might be relevant to whether the hearsay statements possessed particularized guarantees of trustworthiness, a *per se* rule would frustrate the truth-seeking purpose of the confrontation clause and hinder the States in their own "enlightened development" of the law of evidence. *Wright*, 497 U.S. at 825, 111 L. Ed. 2d at 658, 110 S. Ct. at 3151-52.

In the case at hand, defendant contends the circumstances surrounding D.C.'s out-of-court statements require a finding that there was no indicia of reliability. First, defendant argues Casey's account of D.C.'s initial statement is inconsistent with Drnec's testimony. Casey testified at the section 115—10 hearing that when Drnec arrived at the house she told D.C. to repeat to Drnec what had happened. D.C. responded by sticking her fingers in her vagina. Casey told D.C., "[D]on't do it, okay?" She again asked D.C. who did it and D.C. responded, "Scott did it." Drnec testified at the section 115—10 hearing that when she arrived at the house she found Casey very upset and hysterical. After D.C. demonstrated what she had showed her mother, Casey told her that D.C. had said that Scott did it. Drnec's testimony differs from Casey's in that she claims she never heard the child mention Scott's name until later at the hospital. We find this minor discrepancy insufficient to call into doubt the trustworthiness of D.C.'s initial statements. The statements were made spontaneously and, unlike many of her subsequent statements, were not made in response to leading questions.

At the section 115—10 hearing, the trial judge noted that these statements could possibly be admitted under the spontaneous declaration exception to the hearsay rule. To fit this exception, three factors are necessary: (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) an absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence. (*People v. Roy* (1990), 201 Ill. App. 3d 166, 180, 558 N.E.2d 1208, 1218; see also *White*, 198 Ill. App. 3d at 648-54, 555 N.E.2d at 1246-50.) In *Roy*, a child complained to his mother that his butt hurt and asked her to put medicine on it. His mother responded that she could not apply medicine until she knew what had happened to make it hurt. The child responded that his daddy pokes his fingers up his butt. Our court found this statement clearly related to the circumstances of the occurrence and that such an occurrence was sufficiently startling as to produce a spontaneous declaration.

Regarding the second factor, absence of time to fabricate, our court found the fact that the hearsay statement occurred a few days after the sexual act was not determinative. Instead, the court relied on a number of factors to determine that the victim's statements were not fabricated. These factors included the following: (1) it is unlikely that a child of tender years would have any reason to fabricate stories of sexual abuse; (2) a child's statements remain void of fabrication for a longer period of time because the child is apt to repress the incident; (3) it is unlikely the child will discuss such a stressful inci-

dent with anyone but the mother; and (4) the characteristics of young children work to produce declarations free of conscious fabrication for a longer period after the incidents than adults. Moreover, it is well established that merely asking the declarant what happened is insufficient to destroy the spontaneity of a response. *Roy*, 201 Ill. App. 3d at 181-82, 558 N.E.2d at 1219.

■■ ■ These factors, offered to show that a victim's out-of-court statements fall into the spontaneous declaration exception to the hearsay rule, apply equally well to a determination of whether the requisite "particular guarantees of trustworthiness" exist so as to admit the statement under section 115—10 of the Code. We find D.C.'s initial statements to her mother admissible under either theory.

Similarly, D.C.'s statement to Yoder, while likely to be admissible under section 115—10 of the Code, is more appropriately admitted under section 115—13, which provides that in a prosecution for aggravated criminal sexual assault:

"[S]tatements made by the victim to medical personnel for purposes of medical diagnosis or treatment including descriptions of the cause of symptom, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment shall be admitted as an exception to the hearsay rule." Ill. Rev. Stat. 1991, ch. 38, par. 115—13.

At the hospital, Yoder was responsible for taking the child's history. When she asked D.C. why she was there, the child responded by pointing to her vaginal area and saying that Scott touches her down there when he gets tired. Our court has held that in examining a child suspected to be a victim of sexual abuse, details of the sexual acts including how, when, and where the act occurred and who was involved are pertinent information allowed under the statute. (*Roy*, 201 Ill. App. 3d at 178, 558 N.E.2d at 1216.) Section 115—13 is a codification of the firmly rooted common-law exception to the hearsay rule allowing statements describing medical history, symptoms, pain, or sensations made for purposes of medical diagnosis or treatment. Statements admitted under a firmly rooted hearsay exception are considered so trustworthy that adversarial testing would add little to their reliability. *Wright*, 497 U.S. at 821, 111 L. Ed. 2d at 656, 110 S. Ct. at 3149.

Next, we address Elizabeth Drnec's testimony of the statements she overheard at the hospital. D.C. had apparently begun sticking her fingers in her vagina again and, after her mother told her to stop, D.C. replied, "But Scott does it." Defendant argues that the state-

ment is unreliable because it was made only after D.C. had witnessed her mother become extremely upset at home, prior to her arrival at the hospital. We disagree. The reliability of this statement is derived from its simplicity—it is nothing more than a repetition of her earlier statement to her mother at home. The Supreme Court identified spontaneity, consistent repetition, and lack of motive to fabricate as factors relevant to a determination of whether such statements bear a particularized guarantee of trustworthiness. Each of these factors is present in the hearsay statements overheard by Drnec.

This testimony, while clearly satisfying the requirements of the confrontation clause, also fulfills the provisions of section 115—10 of the Code, which requires that the time, content, and circumstances of the statements provide sufficient safeguards of reliability. The short time between her initial statements and those made at the hospital allow for less time to fabricate, the content was an exact repetition of her earlier statement, and the circumstances indicate the response was spontaneous. This consistent repetition also provides the corroborative evidence required under section 115—10(b)(2)(B) of the Code (Ill. Rev. Stat. 1991, ch. 38, par. 115—10(b)(2)(B)). We find no error in the trial court's admission of this testimony under section 115—10 of the Code.

Finally, we address the hearsay evidence offered by Detective Fazio. His interview with D.C. was not recorded or videotaped. While application of these tools may well have advanced the reliability of the out-of-court statements, the Supreme Court has explicitly refused to impose a fixed set of procedural prerequisites to the admission of such statements at trial. (*Wright*, 497 U.S. at 819, 111 L. Ed. 2d at 654, 110 S. Ct. at 3148.) Before the interview, Fazio spoke with Casey to get the basic information about D.C. Fazio then indicates that he prefaced his conversation with D.C. by asking, "What did Scott do to you?" At trial, Fazio contradicted this assertion, saying that he actually began the interview with other questions. Regardless, our inquiry is focused on the testimony offered at the 115—10 hearing, as it is upon this basis that the hearsay statements were admitted into evidence.

The Supreme Court decision in *Wright* dealt with a similar factual situation. In *Wright*, the Idaho Supreme Court found a doctor's interview with a 2½-year-old child regarding suspected sexual abuse lacked the particularized guarantees of trustworthiness necessary to satisfy the requirements of the confrontation clause. The court complained that the interview was performed by someone with a preconceived idea of what the child should be disclosing, and the interviewer

had used blatantly leading questions. The Supreme Court affirmed, noting that despite the spontaneous nature of the child's responses, it is possible that if there is evidence of prior interrogation, prompting, or manipulation by adults, spontaneity may be an inaccurate indicator of trustworthiness. *Wright*, 497 U.S. at 826-27, 111 L. Ed. 2d at 659-60, 110 S. Ct. at 3152.

In the case at hand, Fazio asked D.C. what Scott did to her and she replied, "He touches my body." He then asked her to identify her private parts, but D.C. appeared confused and did not respond. He then asked her mother how she refers to her private parts and Casey replied that she calls her private parts "her body." He produced an anatomical drawing of a preschool child and asked D.C. to indicate her "body" parts. D.C. responded by drawing with a crayon on the area of the vagina, breasts, and buttocks. She then stated, "Scott owees my body and Scott owees my stomach." D.C. then became withdrawn and would not respond to further questioning.

An assessment of Fazio's interview is made difficult primarily because of its brevity. We know for certain of only two questions that he asked: (1) what did Scott do to you; and (2) show me your body parts. No information is offered regarding the procedure followed in the interview and we have no indication of what questions or how many questions were left unanswered by the child. Fazio gave no indication he ever asked her to further identify "Scott," nor do we know whether he asked her the time the incident occurred or at what place.

Our supreme court has held that careful consideration of the circumstances surrounding the victim's statements is particularly important in cases such as this. The State, as the proponent of the out-of-court statements, has the burden of establishing that the statements were reliable and not the result of adult prompting or manipulation. (*People v. Zwart* (1992), 151 Ill. 2d 37, 45, 600 N.E.2d 1169, 1172.) Furthermore, a trial court should not presume from a silent record that suggestive techniques were not used. *Zwart*, 151 Ill. 2d at 45, 600 N.E.2d at 1172.

As noted earlier, hearsay statements are admissible under section 115—10(b)(1) of the Code only if the "time, content, and circumstances of the statement provide sufficient safeguards of reliability." (Ill. Rev. Stat. 1991, ch. 38, par. 115—10(b)(1).) However, we should not expect a perfect record in a situation where the victim is a two-year-old child. Given the inherent difficulties in conducting an interview of this nature, we should not expect consistent repetition and must make some allowance for the limited use of leading questions. Fazio was dealing with a very young child who could not be expected

to consistently recite the abuse which allegedly took place. It is illogical to assume a child will sit down with a complete stranger, such as a police officer, and begin relating a bad experience. If a child did so perform, one might conclude he or she did so as a result of specific coaching. Furthermore, any investigation of sexual charges of this nature will require some specific questions. Despite Fazio's leading question, he did not suggest what "Scott" had done and did not suggest "body parts," other than displaying a drawing. The child was allowed to describe what "body" meant.

■ Questions regarding the admissibility of evidence lie within the discretion of the circuit court. A reviewing court may overturn a trial court's determination only when the record clearly demonstrates that the court abused its discretion. (*Zwart,* 151 Ill. 2d at 44, 600 N.E.2d at 1172.) The Fazio evidence, while lacking procedural detail, sufficiently indicated D.C.'s encounter with a negative experience. Regardless of the limited nature of the Fazio encounter, we find sufficient evidence to sustain the determination of reliability of Fazio's testimony. Accordingly, we find the evidence properly admitted under section 115—10 of the Code and in compliance with defendant's rights under the confrontation clause. After viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

■ Finally, defendant asserts he is entitled to a new sentencing hearing because the trial court improperly considered, as a factor in aggravation, his decision not to make a statement in regard to the sexual assault conviction. Our supreme court has held that a trial judge has the right to evaluate and consider a defendant's lack of contrition and protestation of innocence in light of the relevant facts in the case. Absent an abuse of discretion, the trial court's sentence should not be altered. (*People v. Ward* (1986), 113 Ill. 2d 516, 530-31, 499 N.E.2d 422, 428.) Nevertheless, a careful review of the sentencing hearing record gives no indication that defendant's failure to make a statement in his behalf was even considered in the trial judge's sentencing decision. The only factor in aggravation mentioned was that the sentence was necessary to deter others from committing the same crime. We find no abuse of the trial court's sentencing discretion.

Affirmed.

McCULLOUGH and COOK, JJ., concur.