THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ARTHUR T. GILES, Defendant-Appellant.

Fourth District    Nos. 4—92—0966, 4—92—0967 cons.

Opinion filed May 25, 1994.

834

Daniel D. Yuhas and Lawrence J. Essig, both of State Appellate Defender's Office, of Springfield, for appellant.

Lawrence R. Fichter, State's Attorney, of Decatur (Norbert J. Goetten, Robert J. Biderman, and James Majors, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

In September 1992, a jury found defendant, Arthur T. Giles, guilty of two counts of aggravated criminal sexual assault in violation of section 12—14(b)(1) of the Criminal Code of 1961 (Criminal Code) (Ill. Rev. Stat. 1991, ch. 38, par. 12—14(b)(1)). Based upon these convictions, the trial court also found that defendant had violated the terms of the probation that he was serving at the time arising from a separate, unrelated conviction for unlawful possession of cannabis with intent to deliver. In November 1992, at a joint sentencing hearing, the court sentenced defendant to two consecutive nine-year prison terms on the aggravated criminal sexual assault convictions and to a four-year prison term on revocation of probation in the unrelated possession case, to run concurrently to his other sentences.

Defendant appeals, arguing that the trial court (1) improperly admitted evidence of out-of-court statements made by the victim's mother to medical personnel under section 115—13 of the Code of Criminal Procedure of 1963 (Procedural Code) (Ill. Rev. Stat. 1991, ch. 38, par. 115—13); (2) improperly allowed testimony from a police officer regarding statements made by the victim based upon use of anatomically correct dolls; (3) erred in instructing the jury; and (4) erred by not appointing new counsel to assist defendant in a posttrial motion alleging ineffective assistance of counsel. Defendant also argues that if this court reverses his convictions for aggravated criminal sexual assault, then we should vacate the revocation of his probation based solely upon those convictions.

We affirm.

## I. BACKGROUND

On May 17, 1992, the victim's mother, Lacinda Tucker, came home at about 1:30 a.m. As she approached her apartment, she heard her three-year-old daughter, A.T. (the victim), loudly crying. After Tucker entered her apartment, A.T. told Tucker that defendant had sexually abused her. Defendant had been in Tucker's apartment watching her two children in her absence. As defendant slept, Tucker retrieved both of her children and left the apartment. Later that morning, Tucker went to the police station and informed them of A.T.'s claim of sexual abuse.

Consequently, in May 1992, the State charged defendant with

two counts of aggravated criminal sexual assault of A.T. These counts alleged that defendant committed acts of sexual penetration with A.T. by placing an object in her vagina and by placing his penis against her vagina. The State also filed a petition to revoke defendant's probation, alleging that he violated the terms of his probation by committing these crimes. Defendant was on probation on his September 1991 conviction of unlawful possession of cannabis with an intent to deliver (Ill. Rev. Stat. 1991, ch. 56$^{1}$/$_2$, par. 705(d)).

Prior to defendant's trial, the parties agreed that the trial court could consider the evidence presented at trial on the issue of whether defendant violated conditions of his probation. Also prior to trial, the court found A.T. incompetent to testify.

At trial, Tucker testified that on May 16, 1992, she lived with her two children in an apartment, and defendant lived next door. Her sister worked at a nearby restaurant, and typically, Tucker would pick her sister up in the early morning after she finished working. Usually Tucker's father would come to her apartment and watch her children while Tucker went to pick up her sister from the restaurant.

Tucker testified that on this particular evening, her father did not show up to watch the children. Tucker had to pick her sister up around 2 a.m., so when defendant returned to his apartment around 1:30 a.m., Tucker discussed the situation with him. Tucker had known defendant, whose nickname was "Bubby," for about two years, and they were friends. Defendant offered to watch her children while she went to pick up her sister, and Tucker agreed. When she left the apartment, A.T. was asleep on the couch in the living room, and defendant was sitting on the bed in Tucker's bedroom. Tucker locked the door to her apartment as she left.

When Tucker arrived at the restaurant to pick up her sister, she was unable to leave work, so Tucker returned home, parking her car in a lot across the street from her apartment. When she got out of her car, she heard A.T. crying and quickly went to her apartment. Once she got inside, she picked up A.T. and asked her what was wrong. A.T. then told her that "Bubby had tried to stick his dinker in my beaver." Tucker explained that "dinker" meant penis and "beaver" meant vagina.

Upon hearing this, Tucker took A.T. into the kitchen and asked A.T. if she could tell her anything else. Tucker also looked under A.T.'s nightshirt and noticed that she was no longer wearing her panties. She recalled that when she put A.T. to bed on the evening of May 16, A.T. was wearing a long T-shirt and a pair of panties. Tucker then tried to pull A.T.'s legs apart to examine her, but A.T. refused, stating "no, it hurts." Tucker testified that A.T. told her that defen-

dant also tried to put his finger into her vagina. Tucker did eventually observe a portion of A.T.'s vaginal area, and she described it as being red and irritated, but not a rash. Tucker explained that she had never seen any redness in A.T.'s vaginal area prior to this examination.

Tucker testified that she retrieved A.T.'s panties, put them on her, and went into her bedroom, where she found defendant asleep in bed. Tucker attempted to awaken him, and she confronted him with A.T.'s allegations. However, he would not respond to these allegations; Tucker explained that he "just blew me off." At this point, Tucker retrieved A.T. and her other child and immediately left her apartment.

Tucker took her children to a friend's home and then went back to pick her sister up from the restaurant. After getting her sister, Tucker drove to her mother's house. Tucker's mother, Sue Hedding, convinced her to go to the police station and report A.T.'s allegations. However, Tucker first drove to her apartment and again confronted defendant, who was again asleep. Defendant again did not respond to her questions about A.T.'s allegations, so Tucker left and went to the police station. The police asked Tucker to bring A.T. to the hospital.

Cathy Barr, a registered nurse at Decatur Memorial Hospital, testified that on the morning of May 17, 1992, she examined A.T. regarding A.T.'s allegations of being sexually abused. Prior to examining A.T., Barr briefly discussed A.T.'s allegations with Tucker in order to obtain information to diagnose and treat A.T. Tucker told her that after she had come home, she heard A.T. crying, went up to her apartment, and found A.T. was not wearing any panties. Tucker then related that A.T. said defendant tried to "put his dinker in [A.T.'s] beaver." Additionally, Tucker also told Barr that A.T. said defendant put her on the bed and tried to put his penis in her vagina.

Barr testified that she next discussed this matter directly with A.T. Initially, A.T. was very shy and would not interact. After quite some time, A.T. finally began talking with Barr, and Barr asked her if she hurt anywhere on her body. First, A.T. told her that her knees hurt because she had fallen a couple days before. Barr asked A.T. if she hurt anywhere else, and she responded that "[my] beaver also hurt." Barr asked A.T. what happened to her vagina to make it hurt, and A.T. told her that "[Bubby] tried to put his dinker in my beaver." A.T. then explained to Barr that she was asleep on the couch when defendant woke her, took her to her mother's bed, removed her panties, and then tried to put his penis in her vagina. A.T. further explained that she cried because she did not like what defendant did to her and because she could not find her mother after defendant had done it.

Barr testified that she then briefly examined A.T. At that point, the emergency room physician, Dr. Steven Beltz, arrived to examine A.T. As he did so, Barr observed that A.T.'s vaginal area was quite red, specifically the inner labia portion of her vagina. Barr also noticed that A.T. had a bruise on one of her arms, as well as abrasions on both knees.

Beltz testified that before he examined A.T., he spoke with both Barr and Tucker. Tucker told him that she left A.T. with a boyfriend while she stepped out of her apartment for a short period of time. Tucker further told him that when she returned, she heard A.T. crying, A.T.'s underwear—but not A.T.—was on the couch, and A.T. complained that Tucker's boyfriend had done something to her. Beltz noted that Tucker specifically stated that A.T. told her that the boyfriend tried to put his penis in A.T.'s vagina.

After Beltz obtained this information, he examined A.T.'s vaginal area to determine if she had been injured in a manner consistent with her allegations. Dr. Beltz noted two specific findings from his physical examination pertinent to her allegations. First, he found a bruise on A.T.'s left forearm near her wrist that was the size of an adult thumbprint. He testified that this bruise was "fresh," having been incurred 6 to 12 hours before the examination, and consistent with A.T.'s being held in a very forceful manner.

Second, Beltz found A.T.'s genital area swollen and red. He also found a small amount of blood in her vagina. A.T.'s hymen did not show any evidence of being torn, and Beltz found no evidence of definite penetration. However, he stated that the very small amount of blood in her vagina could have resulted from a microscopic tear in that area. The presence of this blood was consistent with the possible insertion of an object the size of a small finger into A.T.'s vagina. Beltz also explained that because there was no visible tearing of A.T.'s hymen, a normal, erect male penis could not have been inserted into her vagina, but something smaller could have been. The redness and swelling on A.T.'s vaginal area was not something typical for a three-year-old girl. He opined that it likely resulted from friction or rubbing of that area. In Beltz' opinion, the findings from A.T.'s physical examination were consistent with her allegations of sexual abuse.

Hedding testified that on the morning of May 17, 1992, Tucker arrived at her home around 2:30 a.m. and awoke her. Tucker was very upset, and Hedding advised Tucker to go to the police station. Later that morning, Tucker brought A.T. to Hedding's home from the hospital. Hedding then gave A.T. a bath, and while doing so, A.T. spontaneously said, "Grandma, Bubby hurt me." Hedding then asked

A.T. what he had done to hurt her, and A.T. responded that he "stuck his finger in my beaver." Hedding understood A.T.'s reference to "beaver" as a term for her vagina.

Officer Richard Hazen, an investigator with the juvenile division of the Decatur police department, testified that on May 18, 1992, he interviewed A.T. regarding her allegations. After asking a few preliminary questions, Hazen gave anatomically correct dolls to A.T., who correctly identified the color of the shirts on each doll. However, she did not respond when asked if she knew the difference between the truth and a lie. Hazen then asked her to identify various body parts on the dolls. Although A.T. correctly identified several body parts, she did not respond when asked to identify the vaginal area of the female doll and the penis of the male doll.

Hazen then pointed to the vaginal area on the female doll and asked A.T. if anyone had ever touched her there. A.T. immediately responded, "Bubby." Hazen asked if she knew Bubby's real name, and she responded that it was "Arthur." Hazen then pointed to other parts on the female doll, including the buttocks and chest, and asked A.T. if she had been touched in those places by anyone. She responded "no." Hazen next asked if she remembered when Bubby touched her vagina. Initially, A.T. did not respond, but after Hazen asked if it was the same night as when she went to the hospital, A.T. replied, "yes." Hazen also asked A.T. if she could point out on the male doll the parts of the body with which Bubby touched her. A.T. responded by pointing to the doll's penis and fingers. A.T. also explained that it hurt and she cried when defendant touched her. Hazen further asked what she was wearing when defendant touched her, and A.T. responded that she was wearing a T-shirt and underpants. She then explained that Bubby took her underpants off.

Hazen also testified that he interviewed defendant on May 17, 1992. When Hazen asked defendant about A.T.'s allegations, defendant responded that he had always gotten along well with A.T., and he believed that "[these allegations were] coming from [Tucker]." Defendant explained that on the night of May 16, 1992, he came home around 1:50 a.m. after drinking at a party. He described his condition as "high, but not drunk." When defendant returned home that evening, Tucker began arguing with him about his going out without her. Defendant told Hazen that he eventually went up to Tucker's apartment and lay down in her bed, that Tucker lay down beside him, and that he had not seen A.T. that evening. As far as defendant knew, nothing happened until he was awakened by the police the following morning.

Defendant's mother testified for the defense, stating that she had

baby-sat for A.T. several times prior to May 16, 1992. She testified that A.T. had a habit of pulling her underpants up tightly around her crotch, and she would have to tell A.T. to pull them back down. She explained that A.T. "was always doing it."

Scott Corrington testified that he was defendant's friend and took him to the party the evening of May 16, 1992. He explained that he picked up defendant around 8 p.m., and they then stayed at the party until about 1 a.m. Corrington stated that he consumed between 10 and 12 beers at the party and saw defendant also drink a couple beers. Corrington could not remember exactly how many beers defendant had consumed, although defendant appeared slightly intoxicated.

Defendant testified that on May 16, 1992, he and Tucker had been engaged in an ongoing sexual relationship for about two months. That evening as he waited for Corrington to pick him up to go to the party, Tucker approached and asked him if she could go along. However, she was unable to find a baby-sitter for her children, and she became angry at him for going without her. After they had argued for a while, Corrington arrived and defendant left with him.

Defendant testified that he stayed at the party until around 1 a.m. While there, he consumed about five beers. When he returned home, he found Tucker standing outside her apartment. Tucker asked him to come to her apartment and talk for a while. He did, went into her bedroom, and they lay down on the bed together, where they talked until he fell asleep. Defendant testified that he did not see A.T. at any time while he was in the apartment. He also stated that Tucker had asked him if he wanted to have sex with her, but he refused the offer.

After he fell asleep, the next thing defendant remembered was being awakened by Tucker sometime during the morning and her asking what he did to A.T. He told her that "she was full of shit, she was crazy, and she didn't know what she was talking about." Defendant explained that he then went back to sleep. He further testified that after the confrontation with Tucker, the next thing he remembered was being awakened by two police officers. Defendant denied ever touching A.T.'s vaginal area. He also corroborated his mother's testimony that on several occasions he had seen A.T. pull up her underwear tightly against her crotch.

Based upon this evidence, the jury found defendant guilty on both counts of aggravated criminal sexual assault. Based upon these verdicts, the trial court revoked defendant's probation from his prior conviction.

## II. ANALYSIS

### A. *Hearsay Evidence Admitted Under Section 115—13*

Defendant first argues that the trial court improperly admitted Tucker's out-of-court statements to Nurse Barr and Dr. Beltz into evidence under section 115—13 of the Procedural Code. Defendant claims that Tucker's statements to Barr and Beltz regarding A.T.'s allegations of sexual abuse by defendant do not fall under the medical treatment hearsay exception as set forth in section 115—13 of the Procedural Code. He contends that because Tucker's statements were not statements made by the victim to medical personnel, they cannot be admitted under section 115—13 of the Procedural Code.

The State responds that any error in admitting this evidence was harmless because Tucker's statements were merely cumulative to similar statements that the child had made which were properly admitted through the testimony of Tucker, Hedding, Barr, Beltz, and Hazen. The State also argues that this evidence was properly admitted as part of the surrounding circumstances—the *res gestae*—of the case.

■ Initially, we disregard the State's assertion that Tucker's statements to the medical personnel were merely part of the *res gestae* of this case. In 1961, the Supreme Court of Illinois determined that the term *res gestae* was an "amorphous concept [that] has been applied indiscriminately to a multitude of situations, *** [which] not only fails to contribute to an understanding of the problem but may actually inhibit any reasonable analysis." (*People v. Poland* (1961), 22 Ill. 2d 175, 180, 174 N.E.2d 804, 806.) Unfortunately, despite the supreme court's clear direction to avoid use of this archaic relic, its usage pops up on occasion as justification for admitting hearsay statements. We strongly agree with Professor Michael H. Graham that "[n]othing short of complete abandonment of *res gestae* as an explanation of admissibility permits rational analysis of exceptions [to] the hearsay rule." (M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.2, at 624 (5th ed. 1990); see also *Kellman v. Twin Orchard Country Club* (1990), 202 Ill. App. 3d 968, 972, 560 N.E.2d 888, 890 ("*Res gestae* is no longer a term recognized by the Illinois courts"); but see *People v. Levy* (1989), 186 Ill. App. 3d 842, 845, 542 N.E.2d 930, 932-33 (distinguishing the concept of *res gestae* regarding admission of other crimes evidence or prior bad acts from *res gestae* regarding hearsay, and concluding that other crimes evidence *res gestae* remains acceptable law).) We disagree with *Levy* and conclude that the use of *res gestae* adds nothing but confusion.

Turning to the issue of whether Tucker's statements fell under section 115—13 of the Procedural Code, we note that section 115—13 is a codification of the firmly rooted common law hearsay exception

allowing statements of medical history, symptoms, pain, or sensations made for purposes of medical diagnosis or treatment. (See *People v. March* (1993), 250 Ill. App. 3d 1062, 1076, 620 N.E.2d 424, 434-35.) Section 115—13 provides as follows:

"In a prosecution for violation of Section 12—13, 12—14, 12—15 or 12—16 of the 'Criminal Code of 1961', statements made by the victim to medical personnel for purposes of medical diagnosis or treatment including descriptions of the cause of symptom, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment shall be admitted as an exception to the hearsay rule." Ill. Rev. Stat. 1991, ch. 38, par. 115—13.

In *People v. Roy* (1990), 201 Ill. App. 3d 166, 558 N.E.2d 1208, this court similarly considered whether the trial court improperly admitted testimony under section 115—13 of the Procedural Code from a physician concerning statements made by the mother of the child victim to the physician. After noting that the mother told the physician about statements made by the victim which directly implicated the defendant, this court stated the following:

"Arguably such statements are not admissible under section 115—13 as they were provided by someone other than the victim. However, hearsay may be relied upon by physicians in making diagnoses. The Handbook of Illinois Evidence provides that under the common law hearsay exception of statements for the purpose of medical diagnosis or treatment, the statement may be made by either a patient or someone with an interest in his well[-]being. M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.8, at 560 (4th ed. 1984).

Here, the trial court admitted this testimony for the limited purpose of its consideration in [the doctor's] diagnosis. It does not appear the trial court placed reliance upon the statements themselves. Under these circumstances, we find the admission of these hearsay statements to constitute harmless error." *Roy*, 201 Ill. App. 3d at 179, 558 N.E.2d at 1217.

Defendant attempts to distinguish *Roy* by claiming that the error in admitting this testimony from Barr and Beltz was not harmless in this case because (1) two witnesses (Barr and Beltz) testified to Tucker's statements, whereas in *Roy* only one witness (the physician) testified about the mother's statements, (2) A.T., the declarant, did not testify because she was found incompetent, and (3) the repetitious nature of the hearsay statements tended to make the jury perceive Tucker's testimony—and therefore A.T.'s accusations—as more credible than defendant's testimony. We find defendant's distinctions unpersuasive.

That two witnesses testified in this case, as opposed to only one in *Roy*, constitutes only a minor difference. Further, although Barr's and Beltz's testimony about Tucker's comments was repetitious of other similar testimony, we conclude that this repetition was merely cumulative of the properly admitted testimony of Barr, Tucker, Hedding, and Hazen. Also, in *Roy*, the child victim did not testify. Thus, A.T.'s inability to testify does not make this case distinguishable from *Roy*.

■ Furthermore, the evidence in this case strongly supports defendant's convictions. In conclusion, we hold that *Roy* is similar to this case and therefore dispositive of this issue—while Barr's and Beltz's testimony of Tucker's statements may not be admissible under 115—13 of the Procedural Code, under the circumstances of this case, the admission of these hearsay statements constitutes harmless error. See *Roy*, 201 Ill. App. 3d at 179, 558 N.E.2d at 1217; see also *People v. Hall* (1992), 235 Ill. App. 3d 418, 436, 601 N.E.2d 883, 897.

### B. *Use of Anatomically Correct Dolls During A.T.'s Interview*

Defendant next argues that the trial court improperly admitted evidence of A.T.'s statements made to Hazen which included her use of anatomically correct dolls. Relying upon *United States v. Gillespie* (9th Cir. 1988), 852 F.2d 475, defendant notes that the State presented no evidence supporting the scientific reliability of Hazen's use of anatomically correct dolls; without this evidence, defendant claims that Hazen's testimony about A.T.'s statements should not have been admitted. In *Gillespie*, a child therapist stated that in her expert opinion, the child victim's behavior during play therapy with anatomically correct dolls indicated that the child had been sexually abused by a man, not a woman. However, the defendant, a man, had presented a defense that the child's nanny, a woman, had committed the sexual abuse. The appellate court ruled that the trial court should not have admitted the child therapist's testimony without first reviewing the scientific reliability of this evidence under *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013. *Gillespie*, 852 F.2d at 480-81.

Here, defendant asserts that because Hazen's testimony was also based upon A.T.'s use of anatomically correct dolls, the trial court should have reviewed the scientific reliability of her use of the dolls in accordance with *Gillespie*. In making this argument, defendant acknowledges that—unlike this case—*Gillespie* involved the admissibility of an expert opinion. Nevertheless, defendant essentially claims that because both this case and *Gillespie* involve testimony based

upon the use of anatomically correct dolls, the trial court needed to ascertain the scientific reliability of the use of the dolls before admitting into evidence any testimony based upon them. We disagree.

In *Gillespie*, the court required a showing of the scientific reliability of the expert's opinion testimony because that testimony essentially consisted of the expert's *interpretation* of the child victim's use of the anatomically correct dolls during play therapy. In the present case, by contrast (and in the great majority of cases), testimony about the child victim's use of anatomically correct dolls served as a demonstrative aid during both the interview of the child victim and the interviewer's later testimony about that interview. Because Hazen's testimony contained no *interpretation* by him of A.T.'s use of the dolls, no need arose to determine the *scientific* reliability of his testimony.

When used as a demonstrative aid during an interview, child victims typically use the dolls in conjunction with specific questions about events at issue. The dolls allow the child to express ideas that the child may not be able—or is unwilling—to verbalize. This use does not implicate concerns of scientific reliability. Although other reliability concerns may be raised about testimony of a child victim's statements made during an interview involving use of anatomically correct dolls, these concerns are sufficiently addressed under section 115—10 of the Procedural Code (Ill. Rev. Stat. 1991, ch. 38, par. 115—10; see *People v. Barger* (1993), 251 Ill. App. 3d 448, 461-65, 624 N.E.2d 405, 413-16; *People v. Edwards* (1992), 224 Ill. App. 3d 1017, 1025-26, 586 N.E.2d 1326, 1332-33) and are not an issue in this case.

■ In *Barger*, this court considered a child victim's use of anatomically correct dolls and the child's resulting nonverbal hearsay associated with the dolls, and we concluded that the child's gestures and demonstrations may "provide the *most* accurate and reliable portion of that child's statement, if not the child's most vivid recollection." (Emphasis in original.) (*Barger*, 251 Ill. App. 3d at 465, 624 N.E.2d at 415.) We also note that a child victim's use of anatomically correct dolls during trial as demonstrative aids has been found permissible. (*People v. Carter* (1993), 244 Ill. App. 3d 792, 797, 614 N.E.2d 452, 455-56.) Accordingly, we reaffirm our conclusion in *Barger* that use of anatomically correct dolls during an interview of a child victim is merely a demonstrative aid which may provide the child with her most effective means of communicating about the events in question. Therefore, we hold that the trial court properly admitted Hazen's testimony regarding A.T.'s statements during the interview, which included her use of the anatomically correct dolls, and that

the court did not need to assess the scientific reliability of the use of the dolls during that interview.

## C. *Jury Instructions*

### 1. Lack of Mental State

■ Defendant next argues that his convictions must be reversed because the jury instructions for aggravated criminal sexual assault did not include a mental state. In *People v. Burton* (1990), 201 Ill. App. 3d 116, 122, 558 N.E.2d 1369, 1374, this court ruled that a mental state instruction is not required when instructing the jury on the elements of aggravated criminal sexual assault, and we have consistently reaffirmed this ruling. (See *People v. Land* (1993), 241 Ill. App. 3d 1066, 1087, 609 N.E.2d 1010, 1025; *People v. Mason* (1991), 219 Ill. App. 3d 76, 82, 578 N.E.2d 1351, 1356; *People v. Smith* (1991), 209 Ill. App. 3d 1043, 1060-61, 568 N.E.2d 482, 492-93; see also *People v. Bock* (1993), 242 Ill. App. 3d 1056, 1076-77, 611 N.E.2d 1173, 1187-88.) We decline defendant's request to reconsider our decision in *Burton*. See *Mason*, 219 Ill. App. 3d at 82, 578 N.E.2d at 1356.

### 2. Separate Instructions

Defendant also argues that the trial court erred by giving only a single set of instructions (one issues instruction and one definitional instruction) to the jury for the offense of aggravated criminal sexual assault. He notes that he was charged with two separate counts of that offense. By receiving only one issues instruction, defendant claims that the jury was not informed that it was required to find beyond a reasonable doubt that he committed each particular act for both counts or that it had to unanimously find two specific, separate sexual acts. The State responds that the jury instructions, when taken as a whole, properly and adequately instructed the jury. We agree with the State.

This court has recently addressed this same argument. In *Smith* (209 Ill. App. 3d 1043, 568 N.E.2d 482), the defendant was charged with three counts of aggravated criminal sexual assault alleging three separate sexual acts, and the trial court gave just one issues instruction for the offense of aggravated criminal sexual assault. This court noted that in addition to giving one definitional instruction and one issues instruction for the offense of aggravated criminal sexual assault (see Illinois Pattern Jury Instructions, Criminal, Nos. 11.33, 11.34 (2d ed. Supp. 1989) (hereafter IPI Criminal 2d)), the trial court gave an instruction defining "sexual penetration" and a concluding instruction which distinguished the three different ways that sexual

penetration had been alleged (see IPI Criminal 2d Nos. 11.65, 26.01). The trial court also gave the jury six verdict forms, a "guilty" and a "not guilty" form for each of the three alleged sexual acts. (*Smith*, 209 Ill. App. 3d at 1054-55, 568 N.E.2d at 489.) This court considered the use of these instructions as a whole and concluded that because the type of sexual penetration is not an element of the offense of aggravated criminal sexual assault, defendant was not entitled to separate issues instructions distinguishing the three different alleged sexual acts. *Smith*, 209 Ill. App. 3d at 1056-57, 568 N.E.2d at 490.

■ Defendant acknowledges our decision in *Smith*, but asks us to reconsider its holding. We again decline defendant's request. In this case, in addition to giving the jury the issues instruction for aggravated criminal sexual assault, the trial court informed the jury that defendant was charged with two separate counts of this offense and gave the jury the definitional instruction, the instruction defining "sexual penetration," a concluding instruction which explained that two different types of sexual penetration had been alleged, and four verdict forms—a "guilty" and a "not guilty" form for each of the alleged sexual acts. (See IPI Criminal 2d Nos. 2.01, 11.33, 11.35, 11.65, 26.01, 26.02, 26.05.) Additionally, we have recently reaffirmed the proposition that the type of sexual penetration is not an element of the offense of aggravated criminal sexual assault. (*People v. Harper* (1993), 251 Ill. App. 3d 801, 806-07, 623 N.E.2d 775, 779.) Therefore, as in *Smith*, we hold that in this case, defendant was not entitled to separate issues instructions differentiating the two separate alleged sexual acts.

### D. *Appointment of New Counsel for Post-Trial Motion*

After defendant's trial and before his sentencing hearing, defendant sent a letter to the trial court criticizing his counsel's performance. Defendant's letter claimed that his counsel was ineffective because (1) counsel did not present "DNA" evidence (referring to seminal fluid found on a blanket from Tucker's bed which an Illinois crime lab forensic scientist determined had not come from defendant); (2) except for the testimony of Dr. Beltz and Nurse Barr, "no medical records [were] brought up"; (3) "not all witnesses [were] brought up to testify"; (4) he should not have been charged with aggravated criminal sexual assault when the medical evidence indicated that A.T.'s hymen was not torn; and (5) defense counsel's female assistant was counsel's girlfriend and a "nude stripper," and thus had "no business [assisting on] my behalf." Based upon these allegations, defense counsel requested appointment of other counsel in defendant's post-trial motion to investigate these allegations, and

at the sentencing hearing, defendant himself further requested appointment of new counsel. The trial court denied defendant's request.

On appeal, defendant urges that we should remand this case for appointment of new counsel to pursue his claim of ineffective assistance of counsel at a post-trial hearing. Defendant focuses his argument on defense counsel's failure to offer into evidence the laboratory results concerning the seminal fluid found on Tucker's blanket or to call the forensic scientist who conducted the tests on the blanket to testify on defendant's behalf. (This argument tracks the first three issues raised by defendant in his letter to the trial court, as discussed above.) Defendant points out that defense counsel attempted to admit the laboratory results into evidence at defendant's trial, but the State would not stipulate to the chain of custody regarding these tests. Consequently, defense counsel never presented this evidence. Defendant contends that this evidence would greatly bolster his claim of innocence, and defense counsel's failure to present it was not a matter of trial strategy.

When a defendant files a *pro se* post-trial motion raising an issue of his trial counsel's competence, the trial court may, under certain circumstances, appoint new counsel to assist defendant in the motion, but a defendant does not automatically receive new counsel. (*People v. Robinson* (1993), 157 Ill. 2d 68, 86, 623 N.E.2d 352, 361; *People v. Markiewicz* (1993), 246 Ill. App. 3d 31, 45-46, 615 N.E.2d 869, 879.) The trial court should review the factual basis for defendant's claims, and if the court determines that the claims lack merit or pertain only to matters of trial strategy, then new counsel is unnecessary. (*Robinson*, 157 Ill. 2d at 86, 623 N.E.2d at 361.) On the other hand, the court should appoint new counsel if the defendant's allegations demonstrate trial counsel's possible neglect of his case. *Robinson*, 157 Ill. 2d at 86, 623 N.E.2d at 361; see also *People v. Jackson* (1985), 131 Ill. App. 3d 128, 138-39, 474 N.E.2d 466, 474 (new counsel can conduct an independent evaluation of defendant's claims and would avoid the conflict of interest that the trial counsel would experience if he had to justify his actions in contradiction to his client's position).

In this case, defendant essentially filed a *pro se* post-trial motion with the trial court alleging his counsel's incompetence. The trial court, in denying defendant's request for appointment of new counsel, noted that "some of [defense counsel's actions] were trial tactics." The court also stated that "the main issue was the credibility of the witnesses involved in the case."

■ Regarding the seminal fluid found on Tucker's blanket, we

conclude that the trial court's ruling as set forth above implicitly found this evidence irrelevant. This finding is supported by the lack of any testimony or evidence regarding seminal fluid. No seminal fluid was found on A.T., and no testimony was presented that the perpetrator ejaculated when committing these offenses. Additionally, the State presented uncontradicted evidence that only defendant had access to A.T. prior to the acts of sexual assault. Thus, the trial court correctly determined that evidence of seminal fluid found on Tucker's blanket from someone other than defendant was irrelevant.

Furthermore, defendant was charged with penetrating A.T.'s vagina with an object (his finger) and with placing his penis against A.T.'s vagina. Evidence of seminal fluid would have no bearing on a charge of penetration by a finger. Moreover, sexual penetration involving the penis and the vagina requires only slight contact between them in order to prove sexual penetration. (See Ill. Rev. Stat. 1991, ch. 38, pars. 12—12(f), 12—14(b)(1); *People v. Franzen* (1993), 251 Ill. App. 3d 813, 823, 622 N.E.2d 877, 886.) Furthermore, defendant did not assert at trial that someone else sexually assaulted A.T.; rather, he claimed that Tucker fabricated the charges against him out of anger, that A.T.'s physical condition was caused by her tugging up her panties, and that he did not touch A.T.

In sum, we agree with the trial court that evidence of seminal fluid on Tucker's blanket was not an issue presented by the evidence. Therefore, defense counsel's alleged failure to present evidence or testimony concerning the seminal fluid had no effect on defense counsel's competency.

■ Regarding defendant's fourth allegation in his letter to the trial court, we note again that only slight contact with A.T.'s vagina is required to sustain charges of aggravated criminal sexual assault, not actual physical penetration; thus, A.T.'s hymen need not have been torn. Regarding defendant's fifth allegation, we note that this claim has absolutely no bearing on defense counsel's competency. Therefore, because each of defendant's allegations was meritless and had no effect on his counsel's competency, we find that the trial court properly denied defendant's motion for appointment of new counsel to pursue his claims of ineffective assistance of counsel.

■ Because we affirm defendant's convictions on both counts of aggravated criminal sexual assault, we conclude, as did the trial court, that these convictions support the revocation of defendant's probation. Therefore, we do not address defendant's last argument that insufficient evidence exists to support the revocation of his probation.

## III. CONCLUSION

For the reasons stated, we affirm defendant's convictions on both counts of aggravated criminal sexual assault, the revocation of his probation, and his sentences for these convictions and revocation of probation.

Affirmed.

COOK and GREEN, JJ., concur.