THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FREDDIE HILL, Defendant-Appellant.

Fifth District    No. 5—94—0312

Opinion filed April 1, 1996.

Doris Gregory Black, of St. Louis, Missouri, for appellant.

William Haine, State's Attorney, of Edwardsville (Norbert J. Goetten, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KUEHN delivered the opinion of the court:

The defendant, Freddie Hill, was charged with unlawful delivery of a controlled substance in violation of section "401(d)(2) [sic]"[1] of the Illinois Controlled Substances Act (720 ILCS 570/401(d)(ii) (West

[1]The indictment charges defendant Freddie Hill with a violation of section 401(d)(ii) of the Illinois Controlled Substances Act. This specific section establishes that it is illegal to possess any amount of lysergic acid diethylamide (LSD) or an analog thereof. There was no testimony that defendant possessed LSD—only a small amount of cocaine. No issue was raised on the pleadings.

1992)). After a jury trial in the circuit court of Madison County, defendant was found guilty. He was sentenced to 12 years in prison. Defendant appeals.

We must determine whether statements, made outside the presence of defendant, were properly admitted as an integral part of the drug transaction and the *res gestae* of the offense.

The centerpiece of the State's case was a July 7, 1993, recording. The recording was made pursuant to a court-authorized overhear targeting defendant as a suspected drug dealer.[2] The recording contained conversations which occurred prior to the eavesdrop of defendant.

On July 7, 1993, Ronald Raglin, under the direction of the Alton police department, was wired for sound in anticipation of a rendezvous with defendant. Raglin, a police informant, was taken to "Little Mexico," an area of Alton that defendant was known to frequent. He was activated for sound and instructed on what to do. Thereafter, he exited the vehicle, left the police officers, and walked the streets of "Little Mexico" in search of defendant. Raglin walked. As he walked, he talked. He talked to monitoring officers. He talked to two of defendant's brothers. On occasion, he talked to himself. The recording, containing discussions between Raglin and people other than defendant, was admitted and played in its entirety over defendant's objection. The recording was only partially audible. No transcripts were used. The State called a number of witnesses, Raglin, the monitoring officers, and Elizabeth Barnes, to interpret unintelligible sounds and explain events that occurred during inaudible passages. The recording, and testimony that deciphered it, informed the jury of the following facts.

The recording begins with instructions and precautionary advice given by the monitoring officers to Raglin. Thereafter, Raglin begins his search for defendant. He conveys his position to monitoring officers as he walks. He first encounters Sammy Hill, defendant's brother. Although defendant was the target of the covert operation, Raglin asks Sammy Hill to sell him cocaine. Sammy replies that he has no cocaine to sell, but he suggests that Raglin visit the home of another brother, Robert Hill, if he wants to buy cocaine. Raglin proceeds to the home of Robert Hill. Although defendant was the target of the covert operation, Raglin asks Robert Hill to sell him cocaine. Robert

---

[2] The overhear was authorized pursuant to a petition based upon information from an unidentified confidential source. Nothing in the petition portends corroboration of the information or reliability of its source. The legality of the eavesdrop order was never tested.

replies that he does not sell cocaine out of his house. The journey continues. Raglin encounters Eric Johnson, whom he later describes at trial as "another partner or relative" of defendant. Raglin expresses concern that something is wrong. His fear intensifies when Johnson drives past him and ignores his effort to buy cocaine.

After these encounters, Raglin finds the defendant seated in his car, accompanied by an unknown male passenger. Raglin asks defendant to sell him cocaine, and defendant replies "no." Defendant exits the car and walks away. Raglin turns to the passenger and asks him to sell cocaine. The passenger declines but agrees to talk to defendant on Raglin's behalf. The passenger exits the car and walks toward defendant. Raglin follows but is told by defendant to "hold on just a minute." Raglin then returns to the car. Raglin sees Elizabeth Barnes join defendant and his unknown passenger, receive cocaine from defendant, and walk toward Raglin. Barnes approaches Raglin and delivers .9 of a gram of cocaine. Raglin tenders payment and asks her if the cocaine is "Freddie's dope." Barnes says that it is.

The information involving the actual transaction rested more on what Raglin and Barnes testified to than the audible content of the recording.

Prior to commencement of trial, defendant filed a motion *in limine* challenging the admissibility of recorded conversations with individuals other than defendant. Defendant sought to limit the tape's use to those portions that involved Raglin's contact with defendant. The only audible words spoken by defendant were "no" and "hold on just a minute." Defendant asserted that all other conversations were hearsay, prejudicial, and nonprobative. The State's response was twofold. It argued that all conversations contained on the tape were necessary to show the circumstances surrounding the commission of the crime. It also argued that Elizabeth Barnes was an accountable participant in the crime. Her statements, it urged, were admissible as statements of a coconspirator acting in furtherance of the conspiracy to deliver cocaine. The court denied defendant's motion and allowed the tape to be played in its entirety.

On appeal, defendant narrows the issue of error to the admission of conversations with monitoring officers, defendant's brothers, contact with Eric Johnson, and Raglin's gratuitous commentary to himself. Defendant contends that portions of the tape, recording events that occurred in defendant's absence, contained nonprobative, highly prejudicial hearsay. The State insists that the playing of the entire tape was necessary to show the circumstances surrounding the offense and the informant's efforts to locate the defendant. The State urges that the challenged evidence was a part of the *res gestae* of the criminal offense.

The prejudicial effect of certain conversations and commentary is not in dispute. The officers' precautionary advice to Raglin before he exits their car conveys concern over Raglin's safety and cautions against potential violence. Moreover, the informant's commentary during his search for the defendant conveys an air of fear and danger in dealing with the Hill brothers. Conversations with Sammy and Robert Hill establish that both brothers are drug dealers. The conversations insinuate defendant's guilt as part of a family drug business. Raglin's label of Eric Johnson as "another one of [defendant's] partners [or] relatives" bolsters guilt by association that flows from conversations with defendant's siblings.

The question mounts as to any legitimate purpose or reason for injecting this matter into defendant's trial. The recording could easily have been played from a point immediately prior to Raglin's encounter with defendant without diminishing the recording's intended purpose or harming the continuity of the recorded transaction. After the defendant is found, recorded conversations bear relevance to defendant's guilt. The State justifies the admission of third-party conversations as part of the *res gestae* of the offense. The State claims that the other conversations were necessary to show the circumstances surrounding the offense and the informant's efforts to locate the defendant.

The issue is clearly framed. *Res gestae* is the only tendered reason for admitting the third-party conversations into defendant's trial. It is a reason that visits wisdom upon the many legal scholars who have criticized the notion of *res gestae* for its imprecision. *E.g.*, 2 J. Strong, McCormick on Evidence § 268, at 206-08 (4th ed. 1992); M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.2, at 700-01 (6th ed. 1994); 6 J. Wigmore, Evidence § 1745, at 191-93 (J. Chadbourn rev. ed. 1976). The Fourth District Appellate Court per Justice Steigmann recently lamented the continued use of this "archaic relic" and agreed with Professor Michael Graham that " '[n]othing short of complete abandonment of *res gestae* as an explanation of admissibility permits rational analysis of exceptions [to] the hearsay rule.' " *People v. Giles*, 261 Ill. App. 3d 833, 841, 635 N.E.2d 969, 975 (1994), quoting M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.2, at 624 (5th ed. 1990). The uselessness of *res gestae* in analyzing the admissibility of extrajudicial statements is not a novel position. Our supreme court noted in 1961 that *res gestae* is an "amorphous concept *** applied indiscriminately to a multitude of situations *** [that] not only fails to contribute to an understanding of the problem but may actually inhibit any reasonable analysis." *People v. Poland*, 22 Ill. 2d 175, 180, 174 N.E.2d 804, 806 (1961).

We doubt that all extrajudicial statements challenged in this case were necessarily hearsay. We doubt that Sammy Hill's statement was introduced to prove that he had no cocaine to sell or that Robert Hill's statement was introduced to prove that he did not sell cocaine from his house. Whether the statements were introduced for the truth of the matter asserted or not, one brother's lack of cocaine to sell and another brother's practice of not selling cocaine out of his house do not prove anything in regard to defendant's guilt. Nothing said by either of defendant's brothers, Raglin, or the monitoring officers was relevant to defendant Freddie Hill's later conduct.

The State argues that the instructions from monitoring officers, Raglin's conversations with defendant's brothers, and even Raglin's vocal musings as he wandered the streets in search of defendant were all "an integral part of the drug transaction and a part of the *res gestae* of the offense." In truth, the officers' instructions, Raglin's conversations with defendant's brothers, and Raglin's own commentary on events had nothing to do with the transaction that formed the basis of this prosecution. The circumstances surrounding defendant's offense were those circumstances that occurred after defendant was found. The circumstances of the offense were circumstances that involved conduct engaged in by defendant, Elizabeth Barnes, and an unknown accomplice at the scene of the charged drug transaction.

The State's tender of *res gestae* to justify the admission of the entire recording and its contents failed to contribute to an understanding of the problem and inhibited any meaningful analysis. It resulted in a ruling that produced reversible error. The ruling allowed the admission of nonprobative extrajudicial statements that seriously prejudiced the defendant.

Regretfully, the notion of *res gestae* confused the issue. We fear that it will continue to obscure rational analysis and continue to demean established evidentiary rules designed to promote the admission of reliable evidence, so long as lawyers and judges continue to adhere to its use.

The State advances a number of cases that recognize *res gestae* as an appropriate tool for determining the admissibility of other-crimes evidence. *People v. Rogers*, 264 Ill. App. 3d 740, 636 N.E.2d 565 (1992), *appeal denied*, 149 Ill. 2d 658, 612 N.E.2d 521 (1993); *People v. Levy*, 186 Ill. App. 3d 842, 542 N.E.2d 930 (1989), *appeal denied*, 129 Ill. 2d 569, 550 N.E.2d 562 (1990); *People v. Crocker*, 25 Ill. 2d 52, 183 N.E.2d 161 (1962); but see *Rogers*, 264 Ill. App. 3d at 752, 636 N.E.2d at 574 (Greiman, J., specially concurring) (*res gestae* is likened to an entombed vampire that refuses to die. "[N]ow and again 'Count *Res*

*Gestae'* moves the cover of his coffin and \*\*\* circulate[s] in the world of litigators and judges, promising them that they \*\*\* need only mutter '*res gestae'* to cover a multitude of sins." Justice Greiman advocates a stake in the heart and a securely fastened coffin lid). The authority distinguishing other-crimes evidence admissible under *res gestae* from hearsay evidence under *res gestae* has been repudiated. *Giles*, 261 Ill. App. 3d at 841-42, 635 N.E.2d at 975-76.

The State urges that we reject *Giles*. It argues that the complete abandonment of *res gestae* analysis is "ill founded." We disagree. The fourth district's discard of *res gestae* conforms with the beliefs of most legal scholars, is decidedly correct, and is a decision we choose to follow. We join our brethren in the fourth district and disavow the notion of *res gestae*. The doctrine serves only to confuse the determination of the admissibility of out-of-court statements or evidence of other crimes.

For the foregoing reasons, we reverse and remand for a new trial.

Reversed and remanded.

CHAPMAN and MAAG, JJ., concur.