FOURTH DIVISION

 June 30, 2003

No. 1-01-1892

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

 ) Circuit Court of

Plaintiff-Appellee, ) Cook County

 )

v. ) No. 93 CR 19963(02) 

 )

MIGUEL FIGUEROA, ) Honorable

 ) John J. Moran,

Defendant-Appellant. ) Judge Presiding.

JUSTICE GREIMAN delivered the opinion of the court:

A jury found defendant, Miguel Figueroa, guilty of first degree murder and the trial court sentenced him to 60 years in prison.  Defendant appeals arguing that his conviction should be reversed because (1) the trial court admitted evidence of his participation in other, uncharged crimes including robbery, conspiracy to sell drugs and possession of a controlled substance with the intent to deliver, but failed to instruct the jury that other-crimes evidence should only be considered for a limited purpose and was not evidence of guilt; (2) trial counsel's failure to provide the court with a limiting instruction relating to other-crimes evidence denied defendant effective assistance of counsel; (3) he was denied a fair trial because of the prosecutor's closing statement that to consider the second degree murder instruction would be a "slap" to the victim; and (4) the mittimus must be corrected to reflect a credit for 2,814 days served while in custody.

The State concedes that the mittimus is incorrect and should reflect the defendant had spent 2,814 days in custody, having been arrested on August 6, 1993, and sentenced on April 19, 2001.

As to the other issues raised by defendant, we affirm for the reasons set forth below.

After separate but simultaneous jury trials, defendant and Eduardo Estremera were found guilty of first degree murder, although the jury acquitted defendant of the offense of armed robbery. Defendant appealed his conviction for first degree murder and this court reversed the conviction and remanded for a new trial.  
People v. Figueroa
, 308 Ill. App. 3d 93 (1999).

In the second trial, Xavier Burbano testified that he and Dmitry Rabin developed a plan in August 1993 to secure some marijuana and sell the product to their friends at a profit.  

Xavier made contact with an old acquaintance named Alex Ojea, who put him in touch with people who could supply the 10 pounds of marijuana that Xavier and Dmitry sought.  The 10 pounds were to cost $10,000 plus a $500 commission for Ojea.

Xavier and Dmitry secured the $10,500 and thereafter arranged to meet at a car wash in Chicago to complete the transaction.  It was agreed that Dmitry would hold the money while Xavier negotiated the exchange.  At that time, Dmitry had approximately $11,500 on his person.

Xavier and Dmitry drove to the rendezvous, where they met Ojea and waited until defendant and Estremera arrived in defendant's red Astro van.  Estremera brandished a gun and Ojea explained that Xavier and Dmitry had nothing to worry about and they should continue their conversation, although Xavier and Dmitry were unarmed.  Finally after some discussion Estremera aimed the gun at Xavier and said he looked like "5-0," meaning a police officer.  Defendant and Estremera then drove off without concluding the transaction.  Ojea stated that he would attempt to revive the transaction without any guns being involved.

Xavier further testified that the transaction was later revived and, that afternoon, Estremera and defendant again rendezvoused with Dmitry, Xavier and Ojea.  Dmitry had brought a shotgun, which had been placed in the trunk of his car.  The procession continued driving a few blocks and finally stopped across from a park in a residential area.

After the parties exited their motor vehicles, Estremera 

pointed a "big revolver" at Dmitry and Xavier, and Xavier then asked to see the marijuana. Ojea left and returned a few moments later with a small cellophane bag of marijuana.  Xavier testified that he refused Ojea because the entire situation intimidated him and he wished to leave.  At that point, Xavier stood at the passenger side of Dmitry's car, defendant stood a few feet away and Dmitry stood with his back to Estremera at the driver's side.  The defendant then asked "[w]ho's got the money[?]" and Dmitry answered that he had the money.  At that point, defendant raised his arm and shot at Dmitry across the car.  Scientific testimony later showed that the bullet was in a downward direction, contrary to defendant's testimony that he fired the weapon in the air.  

Xavier further testified that after he began to run away, he heard five or six "firecracker shots or pops" that were distinctly different from the loud noise the defendant's gun had produced.  Xavier then returned to Dmitry, lying on the ground, who died in his arms. 

Xavier testified that at the beginning of the day, Dmitry had approximately $11,500 in $100 bills.  He further testified that he did not remove any part of the funds.

Another witness testified that she observed Estremera firing a gun near Dmitry's car three or four times.  The witness further stated that she did not observe Xavier taking anything from the victim's person.  Another witness observed that the shooter had crouched down and taken something from the victim's pocket or waistband.  The witness could not identify what was taken but stated that it was held in the shooter's closed fist as he stepped into his motor vehicle.

The police officer testified that, the next day, pursuant to a "consent-to-search" form, he entered an apartment where Estremera was staying and discovered 51 $100 bills.  Defendant was found hiding near his apartment.

The defendant testified that he had been selling drugs for a few months at the time of Dmitry's death and that he obtained the 10 pounds of marijuana through his connections.  Moreover, he claimed that as a result of the negotiations for that marijuana, he was able to procure it and store it in his motor vehicle.

The defendant testified to the events early in the day where Estremera's suspicion that the decedent and Xavier were police officers broke off the negotiations.  He further testified that he placed the marijuana and his .44-caliber pistol in his wife's motor vehicle preparatory to again meeting with the decedent and Xavier.

Defendant testified that the parties exited their motor vehicles and, at that time, he had his .44-caliber handgun in his right hand for protection.  Defendant stated that he believed that Xavier and Dmitry had additional weapons, and defendant acknowledged that, after a heated discussion and in the midst of loud conversation, he stood on one side of Dmitry's car while Estremera and Dmitry stood on the opposite side.  He then testified that Dmitry reached for what defendant believed was a weapon and that Dmitry intended to kill him.

Upon observing Dmitry's movements, defendant then withdrew his weapon and shot over the car at Dmitry.  He then left the scene in his motor vehicle, but he heard shots coming from the area.  According to defendant's testimony, he did not plan to rob or hurt anyone on the day in question.

On cross-examination, defendant acknowledged that he knew exactly where to obtain marijuana and had done so on several occasions.  Defendant further acknowledged that he received the .25-caliber handgun from Estremera and possessed both weapons, later arranging for their disposition.  Defendant further acknowledged that he never actually observed a weapon in Xavier's or Dmitry's hand.  In rebuttal, the State offered defendant's prior conviction for attempted murder in a previous case as impeachment evidence.

Before closing argument, the trial court instructed the jury as to the law for first degree murder and second degree murder.  During closing argument, the assistant State's Attorney said:

"I'll talk to you about the second degree murder

instruction.  My partner told you about that.

Ladies and gentlemen, don't buy into that

instruction.  That is a slap to Dmitry Rabin."

Upon objection, the court advised the assistant State's Attorney to rephrase the statement.

The jury found the defendant guilty of murder in the first degree and sentenced him to 60 years.

The defendant first notes that the State introduced extensive testimony evidencing defendant's conspiracy to sell drugs as well as his coconspirator's robbery of Dmitry despite the fact that defendant was not charged with a narcotics offense and that the jury in his previous trial had found him not guilty of armed robbery.  He suggests that even if it was appropriate to introduce that evidence, he was denied a fair trial when the trial court failed to instruct the jury in accordance with Illinois Pattern Jury Instructions, Criminal
, No. 3.14 (4th ed. 2000).  Specifically, he claims that the trial court should have instructed the jury that other-crimes evidence could only be considered for a limited purpose and was not evidence of guilt or of a propensity to commit crimes.  Defendant argues that evidence of collateral crimes is inadmissable if relevant only to establish a defendant's propensity to commit crimes.  
People v. Banks
, 161 Ill. 2d 119, 136-37 (1994).  

The defendant argues that counsel's failure to offer the appropriate Illinois Pattern Jury Instruction amounted to ineffective assistance of counsel pursuant to 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). In that regard, he claims that defense counsel's failure to specifically offer or request the court to instruct the jury pursuant to the appropriate instruction and his failure to raise the issue in a posttrial motion should not be an impediment to this court's consideration of the issue.  In other words, defendant argues that we should ignore his waiver of the issue where it comes within the ambit of the plain error doctrine.

Where there is a substantial defect in jury instructions or where the interest of justice so requires, the plain error doctrine will be applied if the evidence of guilt is closely balanced and if the error denied the defendant a fair trial.  
People v. Shields
, 143 Ill. 2d 435, 446 (1991).  

In this case, evidence of guilt is certainly not closely balanced.  Here, the defendant testified as to the prior dealings with the decedent and others relating to drug transactions and, thereafter, acknowledged that he fired a weapon at the unarmed decedent.  We share defendant's concern that admission of other-crimes testimony might suggest to the jury defendant's propensity to commit crimes.  It has been oft said that admission of other-crimes evidence "over persuades" the jury  that defendant is a bad person who deserves to be punished.  
People v. Sutton
, 316 Ill. App. 3d 874, 891 (2000).  

Defendant incorrectly suggests that we review this matter 
de novo
 because there are no substantive issues of facts but only questions of law.  The decision as to whether to admit other-crimes evidence lies within the trial court's sound discretion, and the appellate court will not reverse the trial court's decision absent a clear abuse of that discretion.  
People v. Hansen
, 313 Ill. App. 3d 491, 500 (2000); 
People v. Becerril
, 307 Ill. App. 3d 518, 527 (1999).

Evidence of defendant's commission of other crimes is admissible where relevant to prove any material question other than the defendant's propensity to commit a crime, including 
modus operandi
, intent, identity, motive or absence of mistake.  
People v. Kliner
, 185 Ill. 2d 81, 146 (1998); 
People v. Gilliam
, 172 Ill. 2d 484, 514 (1996); 
People v. Childress
, 321 Ill. App. 3d 13, 22 (2001); 
People v. Lear
, 143 Ill. 2d 138, 147 (1991).

The other-crimes evidence entered in this case all related to the transaction between defendant, his coconspirator, Dmitry and Xavier.  Defendant's firing of the weapon came at a time of bitter antagonism between the parties over the drug transaction.  The cases are uniform that although other-crimes evidence is inadmissable to establish a defendant's propensity to commit crimes, it may be admissible for other reasons.  Here, the testimony as to other crimes touches upon the facts leading up to the commission of the crime for which he was charged as well as evidence of his intent and motive.

Some courts have observed that the trial court must weigh the probative value of such evidence against its prejudicial effect (
People v. Illgen
, 145 Ill. 2d 353, 365 (1991)). If defendant could prevail on that theory, a defendant might mention some other criminal activity.  Thereafter, if the court failed to, 
sua sponte
, go through the exercise of weighing the evidence or give a limiting instruction, a defendant might seek reversal on such grounds.

The State chooses to take an easy way out and suggests that such evidence is part of the 
res gestae
 and, as such, does not require a limiting instruction.  Use of the term 
"res gestae"
 has often been rejected and a more precise statement with respect to the evidence to be admitted has been sought.  Cleary and Graham's Handbook on Illinois Evidence
 provides us with such a clear statement:

"It is trusted that 
res gestae
 will finally receive the burial the Illinois Supreme Court thought it was providing in 
People v. Poland
[, 22 Ill. 2d 175 (1961)], 
Rockford Clutch Div. v. Industrial Commn.
[, 37 Ill. 2d 62 (1967)], and 
People v. Tye
[, 141 Ill. 2d 1 (1990)].  
Accord
 
People v. Dennis
, 181 Ill. 2d 87, 229 Ill. Dec. 552, 692 N.E.2d 325 (1998) (Illinois has abandoned the concept of 
res gestae
); 
Kellman v. Twin Orchard Country Club
, 202 Ill. App. 3d 968, 148 Ill. Dec. 291, 560 N.E.2d 888 (1990) (
res gestae 
is no longer a term recognized by the Illinois courts); 
People v. Rogers
, 264 Ill. App. 3d 740, 201 Ill. Dec. 133, 636 N.E.2d 565 (1992) (P. J. Greiman, specially concurring) (stating the 'hope that this concurring opinion can be the equivalent of a stake in the heart of 
res gestae
 and that the coffin lid may be securely fastened' Amen); 
Lubeznik v. HEALTHCHICAGO, INC.
, 268 Ill. App. 3d 953, 206 Ill. Dec. 9, 644 N.E.2d 777 (1994) (
res gestae
 is no longer in use); 
People v. Hill
, 278 Ill. App. 3d 871, 215 Ill. Dec. 492, 663 N.E.2d 503 (1996) (
res gestae
 disavowed as it serves only to confuse the determination of the admissibility of out-of-court statements or evidence of other crimes)."  M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.2, at 790 (7th ed. 1999).

We agree with the State that where the trial court properly admitted evidence of other criminal acts that occurred at the same time and place and that were related to the criminal action for which the defendant was being tried, no limiting instruction is required.  
This is particularly the case where the acts complained of as evidence of other crimes arose from the very same transaction or set of circumstances as the primary criminal act; in this case, the murder of Dmitry.  See 
People v. Kidd
, 357 Ill. 133, 140-41 (1934); 
People v. Andrae
, 305 Ill. 530, 535-36 (1922).  As noted, the defendant took the stand and acknowledged with great detail his involvement in the sale of drugs to Xavier and Dmitry, apparently deciding that such information was important to his defense. 

Defendant next suggests that the testimony that Estremera went through decedent's pockets searching for money was inappropriate since the defendant already had been found not guilty of the armed robbery charge in his first trial.  However, we find the searching of Dmitry's pockets after the shooting was implicitly a part of the facts surrounding the sale of marijuana; namely, one party bringing a significant amount of money

to the bargaining table, the killing of Dmitry, thereafter the leaving the scene, destroying the evidence of weapons and hiding from the police.  Accordingly, defendant's argument is not well taken.

The defendant next argues that he received ineffective assistance of counsel where his attorney failed to request a limiting instruction with respect to other crimes.  We have previously suggested that no such instruction was necessary where the other-crimes evidence is an integral part of the context of the crime for which defendant has been tried.  In this case defendant's counsel was clearly aware of the nature of the evidence of other crimes, having offered a motion 
in limine
 with respect to them, so trial counsel's decision not to request such an instruction may be considered a matter of trial strategy.  In any event, to sustain a claim of ineffective assistance of counsel, defendant must allege and show that his counsel's performance fell below an objective standard of reasonableness and but for such performance there was a reasonable probability that the result in the trial would have differed.  
People v. Simms
, 192 Ill. 2d 592, 634 (2000); 
Strickland
, 466 U.S. at 687, 694, 80 L. Ed. 2d at 693, 698, 104 S. Ct. at 2064, 2068.

Since defendant has testified to the evidence of other crimes, it is hardly likely a limiting instruction would have affected the ultimate outcome of this matter.  Consequently, because defendant cannot prove prejudice, we find that the defendant received effective assistance of counsel.  See 
People v. Jones
, 269 Ill. App. 3d 797, 807 (1994). 

As to the question of whether defendant's not guilty verdict in the armed robbery charge at the first trial makes a difference, it must be remembered that it was the defendant who asked the question "[w]ho has the money[?]" and the defendant identified the person who had the money.    

Finally, defendant argues that the prosecution's closing argument urging the jury "not to buy" into the second degree murder instruction as it would "be a slap to Dmitry Rabin" is so egregious that it requires reversal.  First, we note that the jury was appropriately instructed on second degree murder and was advised that it had a duty to follow all of the instructions and was not to "single out certain instructions and disregard others."  Clearly, the prosecution is allowed to suggest that the jury may disbelieve defendant's theory of self-defense; however, in this case, reference was to ignoring the instruction where the comment was "don't buy into that instruction."  Here, the closing argument did not attack the defendant's theory of the case but, rather, attacked the jury's obligation to consider the jury instruction that was tendered by the trial court.

On three occasions during the course of the trial, the trial court admonished the jury that opening and closing statements are not evidence and that closing arguments not based on the evidence should be disregarded.  A defendant is not denied a fair trial where the jury is appropriately admonished as to the effect and impact of opening and closing statements and that they do not constitute evidence.  
People v. Witt
, 227 Ill. App. 3d 936, 945-46 (1992).

Upon defense counsel's objection to the statement, the trial court directed the prosecutor to "rephrase the argument."  Such intervention by the trial court certainly suggests that the objection was sustained and that such a direction by the trial court cured any errors caused by the prosecutor's comment.

It has been suggested that, in life, we should be careful for what we wish because we might get it.  After the objection and the court's direction, the prosecutor rephrased her argument and stated:

"That second degree murder instruction, that

was read to you, ladies and gentlemen.  As my partner

explained to you, you have to first look at the

facts to see whether he committed first degree murder 

before you can even go and look at second degree

murder.  My partner went over all the evidence

that showed you that he committed first degree

murder.

Now, they want you to sit back and look

to see is there anything mitigating.  That

means bringing down the first degree to a

second degree.  And what they're presenting

to you, this mitigation, this force that's

going to bring it down from first degree to

second degree is his testimony that you heard

from the second degree is his testimony that

you heard from the stand, I saw Dmitry

reaching around and I thought he had a gun.

Ladies and gentlemen, the car was in

between Dmitry and him.  The shotgun 

was in the trunk.  And he told you from that

witness stand he never saw any guns on

Xavier Burbano or Dmitry Rabin." 

For the reasons stated, we affirm the conviction of defendant, and pursuant to Supreme Court Rule 615(b)(1) (134 Ill. 2d R. 615(b)(1), we correct the mittimus to reflect defendant's 2,814 days in custody from the arrest until sentence.

Affirmed and mittimus corrected.

THEIS, P.J., and HARTMAN, J., concur.