2026 IL App (4th) 241001
NO. 4-24-1001
IN THE APPELLATE COURT
FOURTH DISTRICT

FILED

February 2, 2026
Carla Bender
4th District Appellate
Court, IL

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McDonough County |
| JOSHUA T. DYE, | ) | No. 23CF56 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Nigel D. Graham |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court, with opinion.
Presiding Justice Steigmann and Justice Knecht concurred in the judgment and
opinion.

## OPINION

¶ 1 Defendant Joshua T. Dye appeals from his conviction on three counts of predatory

criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2022)), arguing that (1) there

was insufficient evidence presented by the State on each count to prove him guilty beyond a

reasonable doubt and (2) the trial court erred when it failed to comply with Illinois Supreme Court

Rule 431 (eff. July 1, 2012) when admonishing the jury.

¶ 2 For the reasons set forth below, we affirm in part, reverse in part, and remand for

further proceedings.

¶ 3 I. BACKGROUND

¶ 4 A. Charges Against Defendant

¶ 5 On May 18, 2023, defendant was charged by information with three counts of

predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2022)) for actions that allegedly occurred between November 1, 2022, and May 15, 2023, involving I.B., a child under the age of 13 years. Count I alleged that defendant "caused his finger to make contact with I.B.'s vagina for the purpose of [his] sexual gratification." Count II alleged that defendant "caused his finger to make contact with I.B.'s anus for the purpose of [his] sexual gratification" (see *id.*), and count III made the same allegation concerning defendant's mouth and I.B.'s vagina (see *id.*). At the time, I.B. was four years old. Each charge involved a Class X felony that carried with it a mandatory term of imprisonment of between 6 and 60 years, with a mandatory supervised release period of between 3 years and natural life. *Id.* § 11-1.40(b).

¶ 6                                              B. Trial

¶ 7            The case went to trial in April 2024. Prior to the empaneling of the jury, the trial court addressed the admissibility of I.B.'s pretrial out-of-court statements.

¶ 8                                    1. *Section 115-10 Hearing*

¶ 9            Prior to trial, the State filed its notice of intent to use hearsay statements made by I.B. to her mother, Elizabeth B., before and after I.B.'s Children's Advocacy Center (CAC) interview and to the CAC interviewer. See 725 ILCS 5/115-10 (West 2024). The trial court ruled that both statements were admissible. The court found that the CAC "interview was conducted in an objective fashion" and that none of the questioning "was overly suggestive." The court stated that the questions to I.B. were not leading and that "[t]here were follow-up questions related to what the minor stated. [The] line of questioning was, essentially, led by the answers that were given." The court took into account the fact that I.B. would be testifying at trial and found that "the terminology [was] consistent with a child this child's age." As a result, the court concluded there were "sufficient safeguards of reliability with respect to [the CAC] statements."

¶ 10　　　　Concerning the statements purportedly made to I.B.'s mother, the trial court found they were sufficiently reliable and concluded that any suggestions made to I.B. by the mother during the questioning came in response to questions from I.B. and for clarification. The court further found that the "statements go to the reasons that [Elizabeth] took the minor to the hospital and the [CAC] interview which further makes them relevant and explaining [of] her actions." As to the statement I.B. purportedly made on the day following her CAC interview, the court found it consistent with her interview and further found it spontaneous, which "gave it sufficient safeguards of reliability."

¶ 11　　　　　　　　　　　　　　　　2. *Voir Dire*

¶ 12　　　　Jury selection moved forward in groups, with the trial court asking the initial questions of each prospective panel. In all, there were four groups of potential jurors. For all panels except the third, the judge asked a set of questions based on Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) concerning "certain fundamental principles of American law." In accordance with Rule 431(b), the court asked three of the potential juror groups (groups one, two, and four) if they understood and accepted that (1) defendant is presumed to be innocent of the charges against him, (2) the State must prove defendant is guilty beyond a reasonable doubt before he can be convicted, (3) defendant is not required to offer any evidence on his behalf, and (4) defendant's silence cannot be held against him. *Id.* Each potential juror in these three groups was asked to acknowledge and accept these principles, commonly known as the *Zehr* principles (see *People v. Zehr*, 103 Ill. 2d 472 (1984)), and each did so on the record.

¶ 13　　　　However, as to potential juror group three, the trial court did not specifically read Rule 431(b) or ask potential jurors whether they understood and accepted each of its admonitions. The court individually questioned prospective juror Dunlap—the only potential juror from group

three ultimately empaneled in the case—as follows:

"THE COURT: Okay. Do you know of any reason why you cannot be a fair and impartial juror in this case?

PROSPECTIVE JUROR DUNLAP: No.

THE COURT: Is there anything about the nature of the charge in this case that would prevent you from rendering a fair and impartial decision?

PROSPECTIVE JUROR DUNLAP: No.

THE COURT: Will you apply the law as the Court states it to be without regard to your own personal feelings about what the law should be?

PROSPECTIVE JUROR DUNLAP: Yes.

THE COURT: And if you were chosen to be on this jury, if you believe that the State had failed to prove the Defendant guilty beyond a reasonable doubt, would you have any hesitation in returning a verdict of not guilty?

PROSPECTIVE JUROR DUNLAP: No hesitation.

THE COURT: If you believe the State had proven the Defendant guilty beyond a reasonable doubt, would you have any hesitation in returning a verdict of guilty?

PROSPECTIVE JUROR DUNLAP: No.

THE COURT: Is there anything that's come to mind that's raised any doubt in your own mind as to whether you can serve as a juror?

PROSPECTIVE JUROR DUNLAP: No."

¶ 14     On further questioning, prospective juror Dunlap added:

"PROSPECTIVE JUROR DUNLAP: Well, I gave a deposition for a case

October, November of last year and it was—I was part of a tutoring program in college. And one of the tutors had been accused of sexual misconduct with one of my students.

THE COURT: Is there anything about that experience that would cause you to feel either sympathy or prejudice for someone accused of a crime?

PROSPECTIVE JUROR DUNLAP: No."

¶ 15 The record indicates that the third panel of prospective jurors was present in the courtroom during the questioning of the first two panels. No objection was raised regarding the trial court's failure to discuss Rule 431(b) with juror Dunlap.

¶ 16 3. *The Trial Witnesses and CAC Statement*

¶ 17 a. Elizabeth B.

¶ 18 Elizabeth B. testified that I.B. was born in 2018. Elizabeth had been married since 2010, but she and her husband separated in November 2022 for approximately seven months; she dated and lived with defendant during this time. From late 2022 through early-to-mid 2023, Elizabeth and I.B. lived with defendant's sister and later with a person named Barbara Crowe.

¶ 19 Elizabeth said there were times when defendant would watch I.B. (then four years old) while she was at work. Crowe later took over some of these babysitting duties. According to Elizabeth, she was only aware of only one time that defendant had given I.B. a bath while she was at work. She said he did so "because he was worried that she had soiled herself." Elizabeth testified that defendant would help I.B. get dressed at times, but she had not witnessed him helping her use the bathroom or wipe.

¶ 20 According to Elizabeth, I.B. developed a rash in her genital area at some point in March 2023 and "complained about itching." Elizabeth said she used rash cream on her daughter,

but she did not take her to a physician. She was aware that defendant had put the rash cream on I.B.'s genitals on two occasions, and she was present both times.

¶ 21 Elizabeth said she found pornographic Internet searches on defendant's phone that concerned her. The first time occurred in March or April 2023. Elizabeth said, "It looked like it was a teenage porn genre. *** And then it was still the incest or stepsister, stepdaughter porn."

¶ 22 The second instance was on May 11, 2023, and involved an image search for "little girl panties." Elizabeth took a screen shot of defendant's phone screen, and this was introduced into evidence. She testified that she asked defendant in a text message "if he was planning on buying her new underwear," and he answered, "no." Elizabeth had not spoken with defendant about him purchasing underwear for I.B. Defendant had, however, purchased underwear for I.B. in December 2022. Defendant "and his sister were concerned about [I.B.'s] clothing being too small for her *** [and had] said if [her] underwear [was] too tight for her that it [could] cause— she can get, like, an infection, stuff like that."

¶ 23 In May 2023, Elizabeth found a search history for family-related porn videos on defendant's phone. One of the titles was, "virgin stepsister learns fast," and another was, "familial relations videos." Elizabeth took a photograph of this screen as well, and the photograph was admitted into evidence. The photograph indicates that the search or results were from "Yesterday - May 14, 2023," indicating that Elizabeth was viewing the stored search on May 15.

¶ 24 Also on May 15, Elizabeth asked I.B. whether defendant had ever touched her anywhere:

"Q. Okay. And so after that—after the search for little girl panties, you didn't immediately talk to [I.B.]; correct?

A. No, I didn't.

- 6 -

Q. Did you talk to her after you saw the porn searches?

A. I did. Yes.

Q. And when did that conversation take place?

A. It took place on May 15th.

Q. Of?

A. Of 2023.

Q. And where did the conversation take place?

A. In the bathroom.

Q. And who, if anyone else, was present for that conversation?

A. No one else. Just me and [I.B.]

Q. Okay. And do you recall how you started that conversation with [I.B.]?

A. I asked her if Joshua was touching her.

Q. Okay. And what was her response?

A. She looked at me with a serious look and she said where?

Q. And what was your response to [I.B.]?

A. I placed the palm of my hands on my genitals.

Q. Okay.

A. Like, flat.

Q. Did you say any words to her or did you just gesture to your genital region?

A. I just gestured, yes.

Q. And what, if anything, did [I.B.] say after you made that gesture?

A. She said yes.

Q. And what did you do after she said yes?

A. I asked her how and she—and I told her was he moving his finger? She said yes.

Q. Okay. Did [I.B.] make any gestures with her body as she was telling you this?

A. She was kind of moving her finger up and down a little bit.

Q. Could you put your hand up above the witness stand and show the jury what kind of gesture you are describing?

A. Yeah. She was sitting on the toilet so her legs were a little bit opened.

Q. Okay.

A. I guess, do you want me to sit down?

Q. No. You're fine. I'd just like you to show the jury what [I.B.] did with her hand.

A. (Demonstrating.)

Q. Okay. You've—is it fair to describe your motion as using a finger to stimulate the genital area?

A. Yeah, you can. Yes."

¶ 25 According to Elizabeth, she asked I.B. where in the house the touching incidents took place, *e.g.*, in the living room, bathroom, kitchen, or upstairs bedrooms. I.B. told her that it happened "[e]verywhere."

¶ 26 Elizabeth said she took I.B. to the emergency room later that day, where she was examined by a nurse with specialized training regarding victims of sexual assault. On May 18, Elizabeth took I.B. to meet with the CAC investigator. Elizabeth was not present in the interview

and did not tell I.B. what to say.

¶ 27       Elizabeth testified that, when the two were having breakfast the day after the CAC interview, I.B. told her about an additional incident involving defendant:

> "A. She said that she was—she began to tell me a story. She said that she was in the bathroom with her—with him and that she seen his stick and that it was so disgusting. She kept saying the word over and over again. It was so disgusting.
>
> Q. Okay.
>
> A. It was like a water bottle going off on his stomach.
>
> Q. Okay.
>
> A. Is where it went."

¶ 28       When asked, "What do you think [I.B.] meant when she said she saw [defendant's] stick," Elizabeth responded, "His penis." She then was asked, "And was there anything in particular about [I.B.]'s statement on May 19th that you recognized?" to which she responded, "Yes. It was a couple—once or twice—the first times that me and [defendant were] sexual, the ejaculate went on his stomach."

¶ 29                           b. Nurse Kaylie Gilbert

¶ 30       Kaylie Gilbert, a registered nurse certified in sexual assault examination, testified that she examined I.B. on May 15, 2023, and found no visible evidence of injuries or trauma to the minor's vagina or anus. She stated it was possible for someone to have been assaulted in the manner claimed and not have any visible injuries due to how quickly the body heals at I.B.'s age. Asked whether "children of [I.B.'s] age [are] able to give a detailed time line related to reported sexual abuse," she said, "I would not say that a 4 year old gives good time lines at all. No."

¶ 31                           c. Jamie Carroll

¶ 32          CAC investigator and forensic interviewer Jamie Carroll testified concerning her interview of I.B. The trial court accepted Carroll as an expert without objection. According to her testimony, she performed "around 450" forensics interviews thus far in her career, with the typical interviewee being between the ages of 3 and 18. She said the goal of a forensic interview is

> "to find out if there has been any type of maltreatment or abuse or not. We try to get factual information from children. They can talk about their experiences or things that they may have witnessed. And we do that at a neutral, child friendly environment so they're not scared to talk about what's happened."

¶ 33          In her career, Carroll had undertaken more than three hundred forensic interviews prior to her May 18, 2023, interview of I.B. There were two cameras that recorded the same interview at different angles. The room had two seats, one for the child and one for Carroll. Elizabeth was not present, as it was not Carroll's practice to permit parents to attend, so as to prevent any coaching. She stated, "We want to make sure that we're getting the accurate information and not, you know, mom or dad telling the child what to say while we're in there." She also did not allow parents in the adjacent observation room; only investigators, someone from the Illinois Department of Children and Family Services, or someone from the state's attorney's office would be permitted there.

¶ 34          Carroll testified that it was typical to take a break or two during the interview, as "it's a lot of information. It can be very heavy information." She also said there were times when the child needed a break or when Carroll needed to consult with the investigators to see if she covered everything or needed to ask any follow-up questions. In this particular case, Carroll said that she took two breaks. I.B. stayed in the room the entire time and did not have contact with anyone but Carroll during the course of the interview.

¶ 35 Carroll testified that she allowed I.B. to mark on anatomical diagrams of the body; the writing on the diagrams was Carroll's based on what I.B. told her during the CAC interview. Carroll stated, "I was just writing down the words that she was telling me." She added, "I wanted to get the names of the parts that she called them, what she called them and then I wrote what she said." She also said it was "very rare for a child to call their body parts by their actual names," as "that's just not something that we hear very often." Carroll said that during the interview, she asked I.B. to circle the body parts that defendant showed her. She said, "I wanted to make sure that I wasn't assuming." According to Carroll, I.B. circled "[t]he penis area, genitals or sex organ." She also said that during the time when I.B. was taking about defendant's mouth being in her genital area, "[s]he made a movement with her mouth."

¶ 36 The two anatomical body diagrams were admitted into evidence without objection. On the "girl" diagram, I.B. had marked the "pee pee or poop hole" and "back of pooper hole" areas with circles. The "boy" diagram showed the male penis circled, but it was labeled with "I don't know."

¶ 37                              4. *The CAC Video*

¶ 38 The video from I.B.'s CAC interview was offered into evidence at trial. Defendant objected to its admission, citing the same grounds as were asserted in response to the State's section 115-10 motion (see 725 ILCS 5/115-10 (West 2024)). The objection was overruled, and the video was received into evidence.

¶ 39 The video of the May 18 forensic interview was approximately 44 minutes long. During the interview, I.B. said that defendant had touched her in her vaginal area with his fingers and demonstrated accordingly to the interviewer. She said he had undertaken this act "everywhere" but later said it had occurred in the bathroom. Some of the events took place when her mother was

at home, and others occurred when her mother was at work. I.B. was asked to mark the "girl" diagram where defendant had touched her; she marked the area of the vagina and, later, the anus. She later said that defendant had also removed her pants and touched her vaginal area with his mouth, moving it around. She said that incident occurred when she was in her bed. I.B. further said that defendant had shown her his penis, although she did not know what it was called. I.B. circled the penis area on the "boy" diagram. She said that after he had shown his penis to her, something splashed on his shirt. She said he removed his shirt and put it somewhere, although she did not know where. She described his penis as looking like a "potato." She said the splash was like when someone squeezes a bottle. The video confirmed that Carroll took two breaks during the interview and that I.B. remained alone in the room during the entirety of her absence.

¶ 40                                   5. *I.B.'s Testimony*

¶ 41            I.B., then age five, testified for the State as follows:

"Q. Okay. *** have you ever lived with anyone but your mommy and daddy and your brother?

A. No.

Q. No? Have you ever lived with someone named Joshua?

A. We 'posed to live with Joshua but now we don't.

Q. Do you know why you don't live with Joshua anymore?

A. Because Joshua was being mean to me.

Q. How was Joshua being mean to you?

A. He put his finger in the pee pee hole.

Q. Did Joshua touch you on any other places on your body with his hands or his finger?

- 12 -

A. No.

Q. Okay. Did he touch you on your butt with his finger?

***

A. No.

* * *

Q. Has—did Joshua touch you with his mouth anywhere?

A. No.

Q. Okay. How long has it been since you saw Joshua?

A. I don't know because it's been a long time.

Q. A long time. Do you remember what Joshua looks like?

A. No.

Q. You don't remember?

A. Uh-uh.

Q. I want you to take a look in the courtroom and see if you see Joshua.

A. Okay.

Q. Okay. So let's take a look at everybody in the courtroom.

MS. MAXWELL: Your Honor.

THE COURT: Yes.

MS. MAXWELL: Can I ask the Court to direct the Defendant to look up please?

THE COURT: Yes.

MS. MAXWELL: [Do] you see Joshua in the courtroom today?

A. No.

Q. Okay. Do you remember what Joshua looked like?

A. No.

Q. Okay. And you said it's been a very long time since you've seen Joshua; is that right?

A. Yes.

Q. But you used to live with Joshua?

A. No.

Q. Did you tell me before that you used to live with Joshua?

A. Yes. We supposed to live with Joshua but now we don't because he's been mean."

¶ 42        On cross-examination, I.B. testified as follows:

"Q. My name is Andrew. Do you remember when the Judge just introduced me a little bit ago?

A. No.

Q. That's okay. Kind of forgetful; right? A lot of people watching right now?

A. Uh-huh.

Q. Do you think you can answer a couple of questions that I have for you?

A. Yes.

Q. Okay. So do you remember ever talking with anybody about what Joshua did with you?

A. What?

Q. Do you remember telling anyone—let me back up. So just a couple minutes ago you said that Joshua touched your pee pee hole; right?

A. Yes.

Q. Okay. Did you ever tell anybody about that?

A. No.

Q. Never told anyone?

A. Yes.

Q. Okay. Did you ever have to go anywhere to talk with anybody, besides today, about what Joshua did to you?

A. Yes.

Q. Okay. Was that a long time ago?

A. Yes.

Q. Do you remember doing that or no?

A. No.

Q. Okay. Do you remember staying with your mom in a hotel after you guys weren't living with Joshua anymore?

A. Yes.

Q. Was that also a long time ago?

A. No.

Q. Is that 'cuz you were also in a hotel just a few days ago?

A. I'm living in a hotel right now.

Q. And you were living in a house before that?

A. Yes.

Q. With mommy and daddy and [D.B.]?

A. Yes.

Q. And before you were living at that house, were you at a hotel again with just mommy?

A. No. I think we were at a different house.

Q. You were at a different house. Was it just you and mommy then?

A. No.

Q. Who else was there with you and mommy?

A. I don't remember.

* * *

Q. [Y]ou said that Josh is mean to you and that's why you don't live with him—or you and mommy don't live with him anymore?

A. Yes.

Q. Okay. Has anyone else ever been mean to you?

A. No.

Q. Nobody?

A. Yes.

Q. Is that a yes, no one's been mean to you? I asked that in a silly way, didn't I?

A. Yes.

Q. If anyone else had been mean to you, would you remember?

A. Yes."

¶ 43                          6. *Defendant's Testimony*

¶ 44　　　　Defendant acknowledged that he lived with I.B. and Elizabeth for approximately three or four months between late January to the middle of May 2023, as well as an unspecified period prior to that time. He testified that he took care of I.B. on occasion, which included giving her a bath, applying a medicinal diaper rash cream, and changing her clothes. He said he had put diaper rash cream "on her vaginal area" a few times, sometimes in front of Elizabeth and other times when she was away at work. He also helped I.B. with wiping after the bathroom, if needed.

¶ 45　　　　Defendant denied any contact with I.B.'s vagina or anus:

"Q. Josh, outside of the times you've already testified with assisting with either [I.B.] in the bathroom or applying the cream, did you ever touch the vaginal area of [I.B.]?

A. No.

Q. Outside of assisting in the bathroom, did you ever touch the anus of [I.B.]?

A. No.

Q. Did you ever put your mouth on [I.B.]'s vagina?

A. No."

¶ 46　　　　Defendant admitted to a prior felony conviction for residential burglary in 2017.

¶ 47　　　　　　　　　　　C. Posttrial Motion and Sentencing

¶ 48　　　　Defendant filed a timely posttrial motion, arguing, *inter alia*, error in the submission of the CAC video of I.B.'s interview. He also filed a motion for judgment notwithstanding the verdict, arguing that the evidence was insufficient to prove his guilt beyond a reasonable doubt on each count. Defendant's motions were denied, and he was subsequently sentenced to three consecutive terms of 15 years in prison.

¶ 49  This appeal followed.

¶ 50          II. ANALYSIS

¶ 51  On appeal, defendant argues that (1) the State failed to prove him guilty beyond a reasonable doubt on all counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2022)) and (2) the trial court erred by failing to properly examine prospective jurors in compliance with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). The State argues that defendant forfeited the latter issue because there was no contemporaneous objection and defendant did not raise it in his posttrial motion. Defendant agrees that the issue was not preserved but asks us to review it as plain error.

¶ 52       A. Sufficiency of the Evidence

¶ 53  When determining whether sufficient evidence supported a conviction, an appellate court's function is not to retry the defendant. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). Instead, a court of review must resolve " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is the province of the jury as the finder of fact to determine the witnesses' credibility, and its finding is entitled to great weight. *People v. Smith*, 185 Ill. 2d 532, 542 (1999). A court will reverse only where the evidence is so unsatisfactory, unreasonable, or improbable that it raises a reasonable doubt as to the defendant's guilt. *People v. Evans*, 209 Ill. 2d 194, 209 (2004).

¶ 54  We note that, in assessing the sufficiency of the evidence, the evidence includes I.B.'s out-of-court statements to her mother and in the CAC interview admitted pursuant to section 115-10(a)(2) of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10(a)(2) (West 2024)).

On appeal, defendant does not challenge the admission of these statements. Having been admitted, I.B.'s out-of-court statements constitute substantive evidence in the case. See *People v. Applewhite*, 2016 IL App (4th) 140558, ¶ 63.

¶ 55                                    1. *Count I*

¶ 56        We begin with the evidence concerning count I, which charged defendant with predatory criminal sexual assault of a child under the age of 13 years and alleged that he had "caused his finger to make contact with I.B.'s vagina for the purpose of sexual gratification." See 720 ILCS 5/11-1.40(a)(1) (West 2022). According to defendant, the State's case "on all counts relied entirely on the inconsistent, uncorroborated statements of I.B. who could not even identify [defendant] in court." Specifically, although he acknowledged I.B.'s testimony that he was "mean" to her and touched her "pee pee hole," defendant maintains that her testimony was "vague regarding the time and circumstances of the alleged abuse" and "tainted by suggestion from the outset."

¶ 57        I.B.'s testimony that defendant had been "mean" to her and that he "put his finger in [her] pee pee hole" is directly supportive of the State's case on count I, which alleged that defendant "caused his finger to make contact with I.B.'s vagina." Even if viewed in isolation, I.B.'s trial testimony may be sufficient to support a guilty verdict on count I. Moreover, it need not be viewed in isolation; I.B. also told her mother that defendant touched her in the areas of her genitals and that he was moving his finger. In the CAC interview, I.B. told Carroll that defendant had touched her in the area of her vagina with his fingers. When Carroll asked her to specify where on her body this occurred, I.B. marked the area of the vagina on the "girl" diagram. This evidence is more than sufficient to support defendant's conviction beyond a reasonable doubt on count I.

¶ 58        Defendant argues that we should reject I.B.'s testimony because it is "inconsistent"

and "uncorroborated." It is well settled that the testimony of a complaining witness "need not be uncontradicted, unimpeached, crystal clear, or perfect in order to be considered clear and convincing." *People v. Priola*, 203 Ill. App. 3d 401, 413 (1990); see *People v. Thompson*, 198 Ill. App. 3d 417, 419 (1990). Moreover, "[i]nconsistencies or shortcomings in the victim's testimony will ordinarily present a question of credibility for the trier of fact to resolve." *Priola*, 203 Ill. App. 3d at 413; see *Thompson*, 198 Ill. App. 3d at 419. Even "contradictory testimony of a witness does not *per se* destroy [her credibility] ***, and it remains for the trier of fact to decide when, if at all, [she] testified truthfully." *Sparling v. Peabody Coal Co.*, 59 Ill. 2d 491, 498-99 (1974). "In other words, it is for the fact finder to judge how flaws in part of the testimony affect the credibility of the whole." *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004).

¶ 59        Our task here is to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. March*, 250 Ill. App. 3d 1062, 1070 (1993). We will not substitute our own judgment for that of the trier of fact, especially for questions involving the weight of the evidence or credibility. *Id.* We decline defendant's invitation to do so here. We conclude that the evidence was sufficient to support defendant's conviction on count I.

¶ 60                                    2. *Counts II and III*

¶ 61        Next, we consider defendant's contentions regarding the sufficiency of the evidence on counts II and III, which charged that defendant "caused his finger to make contact with I.B.'s anus" and "caused his mouth to make contact with I.B.'s vagina," respectively. Defendant correctly notes that I.B.'s trial testimony did not support these charges and essentially contradicted them. Asked whether defendant touched her on her "butt with his finger," I.B. responded, "no." When asked whether he touched her with "his mouth anywhere," she again

- 20 -

responded, "no." Defendant argues that there was no live evidence presented at trial on these charges and that the sole evidence of guilt comes from "isolated portions of I.B.'s unsworn out-of-court statements made during her CAC interview" that were "expressly contradicted in her sworn trial testimony."

¶ 62         It was for the jury to consider all of the evidence, including I.B.'s earlier statements and her trial testimony, in reaching its verdict. During her CAC interview, I.B. stated that defendant's fingers touched an area she indicated to be her anus and also that he touched her vagina with his mouth. The purpose of the hearsay exception in section 115-10 "is to alleviate concerns that at trial very young child witnesses often lack the cognitive skills to effectively communicate instances of abuse or might be psychologically impeded from doing so." *People v. Foster*, 2020 IL App (2d) 170683, ¶ 28. Where an out-of-court statement is admitted pursuant to section 115-10, the statute provides that

> "the court shall instruct the jury that it is for the jury to determine the weight and credibility to be given the statement and that, in making the determination, it shall consider the age and maturity of the child, *** the nature of the statement, the circumstances under which the statement was made, and any other relevant factor."
> 725 ILCS 5/115-10(c) (West 2024).

The jury was so instructed here. See Illinois Pattern Jury Instructions, Criminal, No. 11.66 (approved Dec. 8, 2011). Aware of this cautionary instruction, it was for the jury to assess the weight to be given to I.B.'s CAC interview statement versus her testimony at trial.

¶ 63         The trier of fact has the opportunity to hear and see the witnesses and is in the best position to judge credibility. *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007). The law is well settled that a criminal conviction will not be set aside for insufficient evidence unless the evidence

is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt as to defendant's guilt. *People v. Belknap*, 2014 IL 117094, ¶ 67. Moreover, a conviction will not be reversed simply because the evidence is conflicting or contradictory or because the defendant claims a witness was not credible. *People v. Gray*, 2017 IL 120958, ¶ 36.

¶ 64        Accordingly, we conclude that there was sufficient evidence presented to find defendant guilty beyond a reasonable doubt on counts II and III.

¶ 65                          B. Rule 431(b) Admonitions

¶ 66        Next, defendant argues that the trial court erred in failing to comply with Rule 431(b) in its *voir dire* examination of potential jurors, one of whom—Dunlap—was empaneled. Our analysis of a purported violation of Rule 431(b) involves interpretation and construction of the rule and is therefore conducted under the same principles applicable to the construction of statutes. *People v. Thompson*, 238 Ill. 2d 598, 606 (2010). Consequently, our review is *de novo*. *Id.*; *People v. Suarez*, 224 Ill. 2d 37, 41-42 (2007).

¶ 67                              1. *Forfeiture*

¶ 68        Although defendant has challenged the trial court's purported failure to admonish the jury pursuant to Rule 431(b), he acknowledges that the issue was raised neither contemporaneously nor in his posttrial motion. It is well settled that to preserve a claim for review a defendant must both object at trial and include the alleged error in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant asks us to review the issue as plain error.

¶ 69                          2. *Plain Error Doctrine*

¶ 70        When a defendant has failed to preserve an issue for appellate review, a reviewing court may still consider the issue under the doctrine of plain error. *People v. McLaurin*, 235 Ill. 2d 478, 495 (2009). The plain error doctrine applies

" '(1) where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error [or] (2) where a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process,' "

regardless of the closeness of the evidence. *People v. Matthews*, 2017 IL App (4th) 150911, ¶ 16 (quoting *Belknap*, 2014 IL 117094, ¶ 48).

¶ 71　　　　It is well settled that a violation of Rule 431(b) falls under the first prong of plain error analysis. *People v. Birge*, 2021 IL 125644, ¶ 24.

¶ 72　　　　　　　　　　a. Noncompliance With Rule 431(b)

¶ 73　　　　The first step under the plain error doctrine is to assess if a clear or obvious error occurred. *People v. Sebby*, 2017 IL 119445, ¶ 49. The burden of persuasion remains with the defendant. See *id.* ¶ 50.

¶ 74　　　　We begin by examining the requirements of Rule 431(b), which provides:

"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to

respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. July 1, 2012). The State appears to concede error on this point, but it also argues that only a portion of Rule 431(b) was violated and that any error was insignificant because only one prospective juror is involved.

¶ 75 The language of Rule 431(b) is "clear and unambiguous" and "mandates a specific question and response process," pursuant to which the "trial court must ask each potential juror whether he or she understands and accepts each of the principles in the rule." *Thompson*, 238 Ill. 2d at 607. This questioning may be performed either individually or in a group, but there must be "an opportunity for a response from each potential juror on their understanding and acceptance of those principles." *Id.* The committee comments further emphasize that a trial court may not simply give "a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law." Ill. S. Ct. R. 431(b), Committee Comments (eff. July 1, 2012).

¶ 76 Here, the trial court complied with Rule 431(b) with three of the four groups of potential jurors by informing them of the general *Zehr* principles and asking individually whether they accepted and understood them. However, the court did *not* read Rule 431(b) to the group of prospective jurors from which juror Dunlap was ultimately seated, nor did it seek their responses to the required questions.

¶ 77 In *Thompson*, the trial court failed to question any of the prospective jurors on Rule 431(b)'s third principle: whether they understood and accepted that the defendant was not required to produce any evidence on his own behalf. *Thompson*, 238 Ill. 2d at 607. There, the court concluded that the trial court had violated Rule 431(b). *Id.* We find *Thompson* controlling and conclude that the failure to specifically ask the potential jurors in the third panel whether they

understood and agreed with the principles constituted error.

¶ 78　　　　The State argues that the trial court's general questions to Dunlap about whether she had any biases and could decide the case fairly were sufficient; however, the law is clear that general admonitions are insufficient. In *Zehr*, *superseded by rule as recognized in Birge*, 2021 IL 125644, ¶ 31, the supreme court observed that it was not enough that the potential jurors were generally "asked whether they would follow the law as given them by the court even though they might personally disagree with it and whether any reason, moral, religious or otherwise, would prevent their being fair and impartial." *Zehr*, 103 Ill. 2d at 477.

¶ 79　　　　As the supreme court stated in *Birge*, Rule 431(b) mandates a " 'specific question and response process' " and requires the trial court " 'ask each potential juror whether he or she *understands and accepts* each of the principles in the rule.' " (Emphasis in original.). *Birge*, 2021 IL 125644, ¶ 33 (quoting *Thompson*, 238 Ill. 2d at 607). Moreover, " 'the rule requires an opportunity for *a response* from each prospective juror on their understanding and acceptance of those principles.' " (Emphasis in original.) *Id.* (quoting *Thompson*, 238 Ill. 2d at 607). Here, neither Dunlap nor any of the other potential jurors in the third panel were questioned in this manner, so the record does not show that they understood and accepted the principles outlined in Rule 431(b).

¶ 80　　　　Accordingly, we conclude that the trial court did not comply with Rule 431(b) with respect to juror Dunlap.

¶ 81　　　　　　　　　　　　b. Closeness of the Evidence

¶ 82　　　　We now assess whether defendant suffered any prejudice as a result of the error. See *Sebby*, 2017 IL 119445, ¶ 68; *People v. Herron*, 215 Ill. 2d 167, 187 (2005). As our cases clearly indicate, prejudice rests not upon the seriousness of the error but upon the closeness of the evidence. *Sebby*, 2017 IL 119445, ¶¶ 68-69. "What makes an error prejudicial is the fact that it

occurred in a close case where its impact on the result was potentially dispositive." *Id.* (citing *Herron*, 215 Ill. 2d at 187); see *People v. Williams*, 2022 IL 126918, ¶¶ 57-58.

¶ 83 Evidence may be closely balanced when a case turns on a credibility determination between conflicting testimony. *Sebby*, 2017 IL 119445, ¶ 63. There is no credibility contest where one party's account is "unrefuted, implausible, or corroborated by other evidence." *People v. Montgomery*, 2018 IL App (2d) 160541, ¶ 31.

¶ 84 We begin our examination of the closeness of the evidence by observing that the strength of the evidence here differs from count to count. In such a circumstance, we may examine the closeness of the evidence on individual counts in order to assess prejudice from the error at issue. See, *e.g.*, *People v. Moore*, 2020 IL App (1st) 182535, ¶¶ 24, 29 (holding noncompliance with Rule 431(b) required reversal on one count but not the other, as the evidence was closely balanced on the former but not the latter).

¶ 85                                    i. *Count I*

¶ 86 As stated above, count I alleged that defendant touched I.B.'s vagina for the purpose of sexual gratification. Here, the essence of the State's case on count I is a credibility determination between I.M.'s account of the events and defendant's. If viewed in isolation, this conflict of credibility might be viewed as "closely balanced." However, there is more to consider here than just the trial testimony from I.B. and defendant.

¶ 87 First, there is the consistency of I.B.'s accounts, as the essential aspects of her statement to her mother, her CAC interview, and her trial testimony all align. In *People v. Olla*, 2018 IL App (2d) 160118, ¶¶ 35-38, the court found the evidence was not closely balanced where, although defendant denied the victim's allegations, there was some corroboration of the minor's testimony by others. It may not be precisely accurate to refer to a victim's repeated statements as

"corroboration." See *In re A.P.*, 179 Ill. 2d 184, 199 (1997) (stating that corroboration requires "independent evidence which would support a logical and reasonable inference"). Regardless of whether it is accurate to call repetition "corroboration," however, the consistency of a young victim's statements adds to their probative value and diminishes concerns about fabrication.

¶ 88　　　　I.B.'s interview statement is largely consistent with the trial testimony of Elizabeth and Carroll, as well as I.B.'s trial testimony concerning count I. Moreover, while defendant scrutinizes I.B.'s statements for discrepancies, we are mindful of her young age and the time that passed between her first statements and her trial testimony. This is, in fact, one of the reasons for allowing evidence of such interviews at trial:

> " 'The probative value of corroborating complaints in these cases, especially in videotaped form, has been widely recognized. Children may be subject to memory loss in the often prolonged period between the abuse and trial, and videotaping the child's account of abuse at the earliest opportunity preserves the account while it [is] still fresh in the child's memory; in addition, it allows for the examination of the conditions prevalent at the time of the child's initial complaint. [Citation.] A recording close in time to the first outcry, prior to any charges being filed, where feasible, also makes the statement less likely to be the product of suggestion or even manipulation by overzealous prosecutors, parents, or caseworkers.' " *Olla*, 2018 IL App (2d) 160118, ¶ 37 (quoting *People v. Bowen*, 183 Ill. 2d 103, 115-16 (1998)).

¶ 89　　　　While defendant denied the charges, he offered no explanation of why I.B. would lie or fabricate any of her testimony beyond his contention that Elizabeth was mad at him for talking to another woman in the neighborhood. However, Elizabeth was carefully screened from

the CAC interview, which elicited the most damning evidence against him. Even if Elizabeth was "mad" at defendant, the record gives no reason to conclude that her attitude would have impacted I.B.'s statements in the CAC interview. Moreover, the nature of I.B.'s testimony relates to sexual matters that are less likely to be within the knowledge of a four year old. There is little in the record to suggest that I.B. had a reason to fabricate her detailed account of such matters.

¶ 90   Furthermore, defendant's testimony corroborated at least some aspects of the State's allegations. For example, defendant admitted that he would give I.B. a bath, sometimes when her mother was not home. He also said he applied diaper rash medication to her vagina and that he sometimes helped I.B. wipe when she went to the bathroom. Clearly, defendant had access to I.B. that was consistent with her descriptions of events that occurred in the apartment. To be sure, these are not inherently incriminating circumstances. However, it is notable that, according to Elizabeth, she asked I.B. where in the house the touching incidents took place, *e.g.*, in the living room, bathroom, kitchen, or upstairs bedrooms. I.B. told her that it happened "[e]verywhere." Consequently, while it is not inherently incriminating that defendant might help a very young child with bathing or toileting, this limited contact does not jibe with I.B.'s statement about the improper touching occurring "[e]verywhere" in the house.

¶ 91   Finally, defendant's Internet porn searches put things in a different light. His phone reflects searches for "little girl panties," "virgin stepsister learns fast," and "familial relations videos" within a few days of the accusations in question coming to light. This evidence provides a reason to infer that defendant's time alone with I.B. would not have been entirely of an innocent nature.

¶ 92   Under plain error analysis, a defendant's conviction will stand unless the *defendant* shows the error was prejudicial. *People v. Ransom*, 2024 IL App (4th) 230506, ¶ 58. For the

reasons stated above, we conclude that defendant has failed to demonstrate that the evidence in respect to count I was closely balanced and that the trial court's error in admonishing prospective juror Dunlap in accordance with Rule 431(b) prejudiced him.

¶ 93                                    ii. *Counts II and III*

¶ 94         Count II alleged defendant was guilty of finger-to-anus contact with I.B, and count III alleged oral-vaginal contact, all for the purpose of sexual gratification. The evidence on these two charges was largely of the same nature as that presented on count I, with one major difference: I.B.'s trial testimony did not support the charges in counts II and III. When asked at trial whether either type of contact had occurred, I.B. answered explicitly in the negative.

¶ 95         Although we have found that the evidence presented was *sufficient* to support defendant's conviction on counts II and III, this does not preclude an assessment that the evidence on those charges was closely balanced. While the charges were supported by I.B.'s statements to her mother and the CAC interviewer, her failure to repeat the charges at trial is a matter of consequence when evaluating the closeness of the evidence. I.B.'s trial testimony not only failed to support those charges, but it fell on defendant's side of the ledger.

¶ 96         We conclude, therefore, that the evidence on counts II and III was closely balanced. Consequently, defendant has demonstrated both error in the Rule 431(b) examination of the jurors and prejudice arising from that error insofar as counts II and III are concerned. Because we have found the evidence sufficient to have supported defendant's convictions, there is no double jeopardy bar to remanding for retrial on counts II and III. See *People v. Drake*, 2019 IL 123734, ¶ 21 (holding that retrial is the proper remedy if the evidence presented at trial was sufficient to sustain the defendant's conviction).

¶ 97                          III. CONCLUSION

¶ 98          For the reasons stated, we affirm the trial court's judgment as to count I. We reverse

defendant's convictions on counts II and III and remand for further proceedings consistent with

this opinion. We close by commenting that this is an outcome that did not need to be. To its credit,

the trial court largely complied with Rule 431(b), as 3 of 4 panels and 11 of 12 jurors were properly

examined. Still, a small mistake brings a significant consequence. This is an illustration of the need

for trial judges to be vigilant in ensuring that they comply with the rule in the examination of every

prospective juror. But judges are not alone in the courtroom. A defense attorney who truly believes

that the defendant's rights will be better respected if Rule 431(b) admonishments are given should

not be hesitant to point out noncompliance. A prosecutor seeking to insulate a possible conviction

against a reversal like that seen in this case should also act as a double-check against any

inadvertent noncompliance. All involved stand to gain by compliance, so all should be invested in

it.

¶ 99          Affirmed in part and reversed in part; cause remanded.

| | |
|---|---|
| ***People v. Dye*, 2026 IL App (4th) 241001** | |
| **Decision Under Review:** | Appeal from the Circuit Court of McDonough County, No. 23-CF-56; the Hon. Nigel D. Graham, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Christopher McCoy, and Zachary Wallace, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Matthew P. Kwacala, State's Attorney, of Macomb (Patrick Delfino, David J. Robinson, and Timothy J. Londrigan, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |